STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
CHARLES FARMER, DEFENDANT-APPELLANT.

Argued September 12, 1966—Decided November 21, 1966.

See also 45 *N. J.* 520, 213 *A. 2d* 249.

146

*Mr. Raymond A. Brown* argued the cause for appellant.

*Mr. John P. Kozak,* Assistant Prosecutor, argued the cause for respondent (*Mr. Edward J. Dolan,* Middlesex County Prosecutor, attorney; *Mr. Kozak* on the brief).

The opinion of the court was delivered by

FRANCIS, J. The issue to be determined here is whether the defense of double jeopardy is available as a bar to the proposed retrial of the defendant for murder. A previous trial came to an early abortive end when the trial court declared a mistrial *sua sponte* and over the objection of both State and defendant. Thereafter defendant's motion to dismiss the indictment on the ground that he could not be placed in jeopardy again was denied. We granted leave to appeal from the denial.

On November 15, 1963 the Grand Jury of Middlesex County indicted defendant Charles Farmer for first degree murder after he fatally shot his wife Barbara Farmer on September 18, 1963. There is no doubt Farmer killed the deceased, or that immediately thereafter and as part of the incident he shot himself. The principal defense to the indict-

ment appears to be that he was insane at the time of the shooting.

After wounding himself Farmer was taken to St. Peter's General Hospital in New Brunswick, N. J. where he remained under treatment for some time. On February 3, 1964, following a hearing which began on January 22, 1964, the Superior Court, Law Division, found him mentally incompetent to stand trial, and committed him to the State hospital for the criminally insane. See, *Farmer v. State,* 42 *N. J.* 579 (1964). Subsequently, on May 25, 1965, again after a hearing, the Law Division declared him mentally fit for trial, and the State prepared to proceed.

On July 14, 1965, Farmer moved in the trial court for an order to permit pretrial discovery of the State's case. Specifically he asked leave "(a) To inspect, copy and photograph all statements, papers and confessions concerned with the within indictment. (b) To inspect and copy all those grand jury minutes concerned with the within indictment. (c) To inspect and copy all medical, psychiatric and neurological reports pertaining to the defendant. (d) To inspect and copy all ballistic reports and paraffin reports made in connection with any firearms allegedly used in connection with the death of Barbara Farmer. (e) To examine any and all firearms and instruments concerned with the within indictment. (f) To inspect, copy and photograph all photographs concerned with the within indictment. (g) To inspect and examine any clothing worn by Barbara Farmer or Charles Farmer on September 18, 1963." Defendant's affidavit supporting the motion alleges that at least four psychiatrists have stated he was insane at the time of commission of the alleged crime. It then proceeds: "For the above reasons, I respectfully represent to the Court that I have need to examine all Grand Jury testimony given before the Grand Jury of Middlesex County concerning my case in order that I may prepare for my trial along with my attorney, who represents me upon this motion for examining the Grand Jury testimony. * * *" The focus of the affidavit was on the grand jury minutes. It concluded as follows:

"I have retained counsel who has vigorously investigated this case and the difficulty of acquiring facts at this posture convinces me that examination of all the Grand Jury testimony is essential to my defense."

No specific reference was made to a need for examination of statements of witnesses obtained by the State, or a request for copies of any such statements.

At the argument of the motion defense counsel not only sought leave to examine the grand jury minutes; he pursued also permission "to inspect, copy and photograph all statements * * *" as indicated in paragraph (a) of the notice described above. The argument of the parties although not included in the appendix has been examined by us. In substance defendant asserted by his attorney that he needed the State's statements of witnesses because he could not recall the circumstances of the shooting.[1] See *Farmer v. State, supra,*

---

[1] In argument defense counsel said:

"But we stand before the bar ready to go to trial with a defendant whom, I think, it has to be admitted suffered amnesia and was insane at the time. I am before the bar of Justice. I don't know what happened. The State does know what happened.

Now, this I submit to your Honor is the showing of particularized need.

\*       \*       \*       \*       \*       \*       \*       \*

This man present was not present. This man physically functioning was not functioning within the concept of the law considered under the interdict of a criminal charge.

\*       \*       \*       \*       \*       \*       \*       \*

But here this man, insane, helpless, must ask the State for aid.

He must say, 'Give me the statements of those who are going to appear against me. Give me that which will tell me what I did.'

This might even influence a plea. I doubt it very much in this case because a plea of insanity, of course precludes such a thing, but it might conceivably do so. \*  \*  \*

\*       \*       \*       \*       \*       \*       \*       \*

Now, in this case Mr. Farmer was not present at the scene of the crime. In body, yes; apparently as far as any cognizable ability, he had none. He was unaware of what was happening, unable to know what was right, wrong, unable to know and unable to repeat for his counsel or to recall for himself the event."

Counsel then referred to his understanding, that a young attorney, D. T. Hague, was present at the shooting, and he suggested "this man's testimony is necessary to tell Mr. Farmer, now that he has

42 *N. J.*, at *p.* 582. Apparently because of the insanity defense and the allegation of lack of memory of the shooting, the trial court granted the motion and signed a discovery order in the precise language set forth above as paragraphs (a) through (g) of the notice. In doing so Judge Convery commented that the decision "went further than any court has." The ruling required a liberal view of Revised Criminal Practice rule *R. R.* 3:3–7, and relaxation of *R. R.* 3:5–11, *infra*.

The State sought leave to appeal from paragraphs (a) and (b) of the order which gave leave

"(a) To inspect, copy and photograph all statements, papers and confessions concerned with the within indictment;
(b) To inspect and copy all those grand jury minutes concerned with the within indictment."

Because of the unusual nature of the case, we heard oral argument on the application. Thereafter and before our decision was announced, defendant filed an affidavit stating: "I cannot to this day recall any of the events of September 18, 1963 which surround the alleged shooting at my home involving my wife and me." Thereupon we affirmed the trial court's order. *State v. Farmer*, 45 *N. J.* 520 (1965).

When the trial judge observed that his decision went beyond the holding of any of our cases, he was correct. In

---

been declared competent, what happened at that time and place." Further he suggested *Rule* 3:5–11 be relaxed and Farmer given "the right to inspect the testimony of someone who will, for the first time, be able to say to him, 'Mr. Farmer, this is what happened' because he cannot have known."

In opposing the motion, the prosecutor said he stood squarely on *State v. Johnson*, in which the Supreme Court had, while requiring inspection of defendant's confession, denied access to the statements of witnesses. That the prosecutor was thinking in terms of statements of witnesses with respect to the criminal event seems plain. He said:

"* * * And if you give the statements of other witnesses then the next step would be the work product of the police who investigated it, their reports. * * *"

There was no specific discussion as to the exact significance or the exact nature of the discovery covered by the order.

recent years, however, discovery in criminal cases has been undergoing an evolutionary process, undoubtedly stimulated in large measure by the opinion of the United States Supreme Court in *Jencks v. United States,* 353 *U. S.* 657, 77 *S. Ct.* 1007, 1 *L. Ed. 2d* 1103 (1957).

At the time of *Jencks* New Jersey had and still has two practice rules relating to the matters involved here. *R. R.* 3 :3–7 provides:

"The requirements as to secrecy of proceedings of the grand jury shall remain as heretofore."

This rule represented the traditional veil with which grand jury proceedings have been surrounded. But within the past few years we have lifted that veil on being satisfied under the circumstances of a particular case that the policy of secrecy should be subordinate to the search for the whole truth. See, for example, *State v. Mucci,* 25 *N. J.* 423 (1957) ; *State v. Moffa,* 36 *N. J.* 219 (1961) ; *State v. Clement,* 40 *N. J.* 139 (1963) ; *State v. Farmer, supra.*

Moreover, following *Jencks, supra,* the Court held in *State v. Hunt,* 25 *N. J.* 514 (1958), that when a witness for the State in a criminal proceeding testifies that prior to taking the witness stand he had refreshed his recollection from notes made earlier by him or some other person, defendant was entitled to have such notes produced for his examination and use on cross-examination, if desired. The opinion plainly indicated also that if the witness had made notes or a statement prior to trial covering the topics of his testimony, the notes or statement were likewise subject to defendant's demand, even though the witness had not used them to refresh his recollection before trial. See *State v. Johnson,* 28 *N. J.* 133, 143 (1958).

*R. R.* 3 :5–11 says:

"Upon motion of a defendant made at any time after the filing of the indictment or accusation, the court shall order the prosecutor to permit the defendant to inspect and copy or photograph designated

books, tangible objects, papers or documents other than written statements or confessions made by the defendant obtained from or belonging to the defendant and may, if the interests of justice so require, order the prosecutor to *permit the defendant to inspect and copy* or photograph written statements or confessions made by the defendant and *designated books, tangible objects, papers or documents obtained from others except written statements or confessions."* (Emphasis added)

We interpreted this rule to require the State to permit a defendant to inspect and copy a confession allegedly made by him. It was said that such disclosure, although not required constitutionally, clearly promoted the quest for truth. *State v. Johnson,* 28 *N. J.* 133 (1958). Since that time it has become routine practice for county prosecutors to supply a defendant with a copy of his confession whenever such a request is made.

The defense motion in *Johnson,* however, had another aspect. It sought leave to inspect statements made by prospective witnesses for the prosecution. On its face such request was squarely within the express proscription of *R. R.* 3:5–11, *supra.* As noted above, we had already held in *State v. Hunt, supra,* that during the trial and when a witness is on the stand, the prosecution must yield to defendant's demand for production of any pertinent notes or statements made or used by the witness prior to the giving of his testimony. See also, *State v. Reynolds,* 41 *N. J.* 163, 182 (1963). But although we were aware of the ongoing agitation for broader discovery in criminal cases, and the arguments for and against such discovery, we felt it unwise to abandon or revise our rule "without fuller experience with the practical operation of *Hunt* and more information with respect to experience in other jurisdictions in which pretrial disclosure exceeds" what had been authorized in New Jersey. *State v. Johnson,* 28 *N. J.,* at *p.* 143. It was pointed out further that Johnson had made no showing which would invite relaxation of *R. R.* 3:5–11 under the provisions of *R. R.* 1:27A. Finally the opinion suggested that the problem should be explored at a judicial conference at such appropriate time in the future

when all considerations relevant to the just and proper administration of the criminal law could be presented.

Study of the problem continued until another aspect of it was submitted for judicial determination. In *State v. Tate,* 47 *N. J.* 352 (1966), this Court decided that under the circumstances presented the defendant was not entitled to an order to compel certain State's witnesses (who were to be produced at the trial) to testify on depositions in advance of trial. In that opinion the bar was advised of the scheduling of a Judicial Seminar in September 1966 to be open to all who might contribute to solution of the problem of discovery in criminal cases. The Seminar was held and the material presented is being assembled for this Court's consideration. 89 *N. J. L. J.* 613 (1966).

The development of discovery in criminal cases has been outlined not only to show its evolution in our State, but also to indicate that the major controversy has centered around efforts on the part of the defense to obtain copies of the statements of the State's witnesses, who saw the crime committed or who furnished information tending to establish defendant's criminal participation in it. There is no reported case in our State in which the defendant moved for or was allowed inspection of investigation reports of police or detectives, or summaries of such reports, or reports or written opinions of such persons or members of the prosecutor's staff as to the guilt or innocence of the accused. Matters of that nature, which are generally thought of as "work product," have been free from inspection demands. It was in this legal milieu that Farmer moved for the generalized and unspecific discovery set out in paragraph (a) of his notice.

When the motion was argued in the trial court, and the propriety of the resulting order argued in this Court, it was obvious that the focus of the collective minds was on the right of the defendant to inspect and copy the signed or unsigned statements of the State's witnesses, in the sense that such statements were thought of ordinarily. That is, attention was on statements signed or unsigned taken by police authorities

from witnesses relating to the criminal incident itself, rather than on statements or reports of police officers concerning matters which occurred after the shooting and which were not directly associated with it. This is evidenced by defendant's affidavit in this Court that he could not recall any of the events which surrounded the "alleged shooting at my home, involving my wife and me." Also, our *per curiam* opinion denying leave to appeal from the order recites that the "State seeks to appeal from an interlocutory order granting defendant pretrial discovery of grand jury testimony and *statements taken by the prosecutor* from persons other than defendant." *State v. Farmer, supra,* 45 *N. J.,* at *p.* 521. Moreover, in the latest case of *State v. Tate, supra,* when the Chief Justice was speaking of the various types of discovery we had sanctioned previously, he described the *Farmer* holding as follows:

"Where, because of insanity, a defendant was unable to aid his counsel in *reconstructing the criminal event,* we ordered the State to permit pretrial inspection of both grand jury testimony and statements taken by the State from persons other than the defendant." (47 *N. J.,* at *p.* 355; emphasis added)

All of the above discussion is not set down to demonstrate that the prosecutor's interpretation of the scope of his obligation under the discovery order (which precipitated the controversy now before us) was correct. The purpose is simply to reveal the climate in which he was called upon to construe the order. Although we agree that his interpretation was incorrect in the light of its broad and unrestrained language, that climate is significant in evaluating his good faith. Basically the difficulty arose when the prosecutor consented to the *form* of the order prepared by defense counsel, which granted leave:

"(a) To inspect, copy and photograph all statements, papers and confessions concerned with the within indictment."

If there had been insistence upon more specificity in the light of the argument, the difficulty might not have arisen.

In any event, after the execution of the broad order, the prosecutor delivered to defense counsel the testimony of the witnesses before the grand jury, copies of signed statements of five witnesses and copies of the notes of oral statements of several other witnesses. These statements squared with the notion that defendant was to be aided in the reconstruction of the criminal event.

On January 4, 1966 trial of the indictment commenced with the impaneling of a jury. As the jurors were drawn and *voir dire* interrogation began, it was made clear by the State that reliance was to be placed on the testimony of lay witnesses to establish Farmer's legal sanity and therefore his criminal responsibility for the crime. For some reason, which is of no moment on this appeal, a mistrial was declared by consent of the parties. Thereafter, there was an interval of 13 days before the cause was again reached for trial. During that period the defense knew the prosecution intended to rely *in rebuttal* on lay testimony to prove Farmer's sanity. (See *State v. Whitlow,* 45 *N. J.* 3, 23 (1965)). Counsel knew also that he had not been furnished with any signed statements or notes of oral statements of any such witnesses. Yet the record reveals no evidence of a demand for the names of such witnesses or their statements. A permissible inference is that experienced counsel construed the discovery order, in this respect at least, in the same fashion as the prosecutor.

Drawing the jury for the second trial began on January 17, 1966, and two weeks were consumed before the full panel of 14 jurors was completed. During the *voir dire* interrogation it again appeared that the State would rely on lay testimony in rebuttal to prove defendant's sanity. The trial judge in his memorandum denying the later double jeopardy plea recognized this. He said:

"* * * [S]uch voir dire disclosed that the state apparently had no contrary professional psychiatric testimony [to defendant's claim of insanity] but would rely entirely upon lay opinion as to the defendant's sanity." (insertion ours)

At defendant's request during the *voir dire,* the State gave him a list of the witnesses it intended to call at the trial. This was done so an inquiry could be made of each prospective juror as he was called as to whether he knew any of those witnesses. The list included the lay witnesses, most of them police officers, who were to be called by the State in rebuttal on the issue of insanity. Defendant's attorney then knew that no signed or unsigned statements of these persons had been furnished to him. Yet at no time during the two weeks of jury selection or after the introduction of testimony and exhibits began, until the impasse to be discussed later was reached, does the record reveal that he called this fact to the attention of the judge or made a motion that their statements, if any, be delivered to him, or that the suggestion was advanced that such statements were within the scope of the discovery order. Moreover, when the jury had been completed and sworn, the State and defense presented their openings. Again the assistant prosecutor made it plain that in meeting the claim of insanity the State would produce and would rely upon the testimony of lay witnesses to counteract professional psychiatric evidence to be offered by defendant. The significance of this emphasis on lay testimony could not have escaped defense notice; nor can it be deemed likely that the defense did not realize that witnesses would be called in addition to those whose statements had been turned over to defendant.

At this point, even though this appeal is from an interlocutory order and the factual record is therefore incomplete, it seems advisable to digress from the trial proceeding in order to refer to certain background material which beyond question was known to the defense.

For some time before the shooting marital discord existed between Farmer and his wife Barbara. Civil litigation was pending between them in which each was represented by counsel. In one pending action Farmer was seeking to have his wife declared mentally incompetent. On August 16, 1963, Farmer's attorneys in the civil proceedings engaged Pinker-

ton's National Detective Agency to provide guards on the Farmer premises each night thereafter from 8 P. M. to 7 A. M. to deny entrance to Mrs. Farmer and certain other persons. In addition, the attorneys obtained an order from the county judge, who later tried the homicide case, restraining Mrs. Farmer from entering the building thereon, which was a combination residence and office. Thereafter, and until September 18, the day of the homicide, the Pinkerton guards performed the required night duty.

On September 18 at about 5 P. M., by arrangement between the attorneys for Mr. and Mrs. Farmer, Mrs. Farmer in company with Douglas T. Hague, an associate with the law firm representing her, and some other persons, went to the premises to pick up some of her belongings. On arrival there Mrs. Farmer and the attorney walked upstairs to a second floor bedroom. Mr. Farmer followed them into the room and some words were exchanged. While she was engaged in gathering her clothing and while the attorney was still in the room, Farmer shot her and then turned the gun on himself. The police and Pinkerton representatives appeared on the scene within a very short time thereafter.

We return now to the trial and the outline of its progress after the opening. The State called two witnesses, one a member of the local police department, the other an identification officer attached to the prosecutor's staff. They described the Farmer premises generally and the bedroom wherein the shooting occurred. They identified a number of relevant photographs including some showing the bodies of the defendant and his wife on the bedroom floor shortly after the fatal event.

Then a Sergeant Earl F. Eichler of the local police department was produced. He and Officer Harry Emmons arrived at the Farmer residence a very few minutes after the fatal shooting, and while Mr. and Mrs. Farmer were lying on the floor of the bedroom. On reaching the second floor Eichler was handed a sweater by Hague. It was wrapped around a revolver. Continuing into the bedroom he found Farmer

lying on the floor with his head on a pillow. Sergeant John Revie of the Pinkerton Agency was kneeling to the right of him. Mrs. Farmer was lying on the floor with a portion of the upper part of her body in the clothes closet and the remainder in the bedroom. Eichler went to the left side of Farmer; Hague was alongside Eichler. Farmer's eyes were open and he was conscious. At this point in the assistant prosecutor's examination it appeared that Hague had made a statement to Eichler which Farmer had answered or commented upon. Defense counsel objected and, after the jury was excused, he said that the prosecutor had not given him any statement from Eichler prior to trial, as he was required to do under the discovery order which we have discussed above.

The assistant prosecutor replied that he did not have what he considered a statement from Eichler within the meaning of the order. He did have a three-page report from Eichler entitled "Supplementary Offense Report—Department of Police," made to his superior on the day of the shooting, and later made available to the prosecutor's office. It set forth the circumstances under which he was sent to the Farmer premises, the officers who accompanied him there and what he saw and heard while there, particularly the comment of Farmer in the presence of Hague and the Pinkerton man which he was about to testify to when the defense objection came. The report referred to a number of other persons who responded to Eichler's telephone call, such as a doctor, members of the local rescue squad who removed Farmer to the hospital, additional police officers and representatives of the prosecutor's office, who took pictures and measurements. It listed a number of articles, considered material to the case, such as a revolver and an automatic pistol, cartridges, a shoulder holster, etc., as well as objects, such as jewelry and the like, removed from Mrs. Farmer's body, and her handbag and its contents. It reported finally that all of the articles were delivered to police headquarters and locked in the safe. The first page of this report was signed by Sergeant Eichler.

During the argument as to whether Eichler's report should have been furnished to defendant in advance of trial, in answer to court questions it appeared that the prosecutor had in his file a number of signed and unsigned reports of police officers and sheriff's officers. As it later appeared when produced, they referred to investigational efforts and other activity, such as guarding Farmer during his stay in the hospital; copies of reports and statements given by Pinkerton operatives to their superiors and perhaps some statements of Pinkerton men given directly to the police; and affidavits and one signed statement of Sergeant John Revie, the Pinkerton officer who was on the premises in the Farmer employ when the shooting occurred. One, a lengthy affidavit dated September 26, 1963 covered, among other things, Revie's version of the conversation in the bedroom which Sergeant Eichler was about to describe when the objection came; the jurat thereto was taken by an attorney associated with the office of Farmer's attorneys. Some of the documents were summaries of the investigation and the case, prepared either by local police and delivered to the prosecutor or by a detective on the prosecutor's staff. Two of the other three Revie affidavits were made before the homicide occurred and outlined his activities on the Farmer premises, including an account of an alleged unpleasant visit there by Mrs. Farmer on August 28, 1963. The jurats on these affidavits were signed by attorneys representing Farmer, and of course were in their possession before the shooting. The fourth statement, undated but undoubtedly signed very shortly after the shooting, is designated a "report * * * relative to the incident * * * on September 18, 1963" apparently made to the Pinkerton Agency. It covers substantially the same material as appears in the lengthy Revie affidavit already described, sworn to before one of Farmer's attorneys.[2]

---

[2] The State had already delivered to the defense Revie's lengthy testimony before the grand jury. In addition the State had turned over at the same time a 19-page statement of Revie in question and

Included among these papers was an unsigned memorandum to the prosecutor dated May 26, 1965, a year and a half after the event, noting an unsolicited conversation with one of

answer form made within a few hours after the shooting. In that statement Revie said he had given "depositions" previous to the shooting to Farmer's law firm, about matters occurring during his guard duty on the Farmer estate. These "depositions" undoubtedly are the Revie affidavits of August 29 and September 4, 1963 prepared by and sworn to before Farmer's attorneys. Copies of them were among the papers submitted to defendant at the trial. Moreover, on Revie's grand jury appearance he said he had talked about the case on two occasions with Farmer's attorney (not present defense counsel) before testifying. Therefore, Revie's knowledge of the case was thoroughly in the hands of the defense before trial, and it is unlikely in the extreme that Farmer suffered any prejudice in not receiving the additional and largely repetitive statements about the criminal event and the circumstances preceding it.

The report of Officer Engel delivered at the trial referred to a comment made by Farmer after the shooting and while he was lying on the floor, apparently in answer to a comment by *the witness* Hague which Farmer overheard. Farmer's alleged remark in the report appears to be the only fact of any consequence not contained in testimony or other statements already in the defense possession before trial. But the defense did have before trial *Hague's* extensive testimony before the grand jury as well as his full 36-page statement in question and answer form made about two hours after the shooting.

One of the police reports furnished at the trial and complained about by defendant was made on August 24, 1965, and described the purchase of the fatal gun by defendant from one Hoey in the presence of Pinkerton agent Soriano. This was not news to defense counsel. In Revie's testimony before the grand jury he talked of Farmer's application for a permit to buy a gun and his purchase of it on September 13, five days before the fatality. Additionally, in the ballistics report furnished to defense counsel *six months* before trial, a notation appears that the revolver examined was purchased by Farmer on September 13, 1963 from Frank Effinger. (The police report showed the place of purchase as Effinger's Sporting Goods, Inc.)

Other police reports delivered at the trial were in large measure investigation summaries, repetitive of material already in the defense possession, and not particularly significant otherwise. However, a number of them, as has been said, reported on the officers' observations of, conversations with and activities of Farmer in the hospital after he shot himself. There is no doubt they contained substantial material relevant to the issue of insanity later projected as a defense by Farmer. It is clear that under the discovery order the defense should have had them before trial.

Farmer's daughters. At oral argument we were advised that the State did not intend to call her as a witness.

Included also were a number of reports and statements from police officers and sheriff's men who had been detailed to guard Farmer's room during his stay in the hospital. They seem to be the ones most seriously objected to by defense counsel. They reported Farmer's condition in the hospital, his physical and mental activity while there, his conversations with the officers and others, such as members of his family, his attorneys and an officer of his engineering company. It appears also from these reports that during the early part of the hospital confinement, at the request of Farmer's attorneys, Pinkerton men also were stationed in the hospital room.

The above outline is intended to indicate the nature of the reports and statements which had not been delivered to the defense in advance of trial. No attempt has been made to set down their content in precise detail.

While Eichler was on the witness stand and before any examination of the reports and statements by the court or defense counsel, the judge expressed the view that, because of the allegation of lack of recollection on Farmer's part, they constituted "statements," or "papers" within the broad scope of paragraph (a) of the discovery order, and should have been turned over to the defense prior to trial. The judge inquired as to the number of such papers which were in the State's file. He was told there were "quite a number." (In fact 28 were produced.) Then the following took place:

"The Court: When do you want them?
Mr. Brown: Now, sir.
The Court: Do you want a mistrial now?
Mr. Brown: I am not moving for it. My gosh, sir.
The Court: Well, I don't want one.
Mr. Brown: I don't know why the Prosecutor cannot cure this. If your Honor is in accord with my argument I would be content if there are quite a few to have them delivered to me now so that I can determine how long it would take me to examine them and have the trial continue at this point, subject to what I discover. I have no purpose in pressing for a mistrial.

I further wish to state I limit my argument to the conditions of what I consider an order of the Supreme Court. I cast no aspersions on anyone."

At this time the court examined Sergeant Eichler's report and suggested that it should have been made available to defendant. In reply the assistant prosecutor said it was his view that such reports were of the type which under *State v. Hunt* must merely be made available to the defendant at trial for cross-examination of the witnesses. After some short colloquy Mr. Brown said:

"Well, your Honor, if the Prosecutor refuses to give me the paper then I have no alternative but to press for a mistrial.

I just want to make clear to your Honor that I do not press or push anybody, but if I don't get what the order says then I will ask for a mistrial."

Counsel declined to proceed with the cross-examination of Eichler or to let the trial proceed any further until he received all the statements and reports. He said:

"Well, I object to proceeding with any other witness if I am to be limited in that way [referring to the State's offer to use other witnesses and not to introduce any matter contained in a report until all papers were given to him]. I will therefore request a mistrial because the Prosecutor has not obeyed the order of the court.

I ask for everything he has got. I ask for it now. I ask your Honor to permit me to have it prior to continuing, and if your Honor does not see fit and rules in accordance with that, I then ask for a mistrial.

I don't wish to press it, but that is my position." (Insertion ours)

Thereafter the assistant prosecutor said:

"Well, I'm the last one, your Honor, next to Mr. Brown, who wants a mistrial to occur in this case. We have spent too much time on it already."

A recess was taken until the following morning to permit the State to remove the pertinent papers from the file and deliver them to the defense that afternoon. The State made the delivery, except for the copies of the Pinkerton Agency report

and statements of its operators to their superiors (described above) concerning their activities on behalf of Farmer prior to the fatal event. Apparently the assistant prosecutor was not familiar with them but, since they had been "specifically requested," a search disclosed them in the office and they were given to Mr. Brown, presumably on February 3.

When the trial was resumed, apparently two days later, February 3, defense counsel moved to suppress all of the evidence disclosed by the statements and reports, and all evidence which "would flow" from them. And he said that if the court declined to suppress, then he moved for an acquittal. A lengthy argument followed in which the prosecutor was charged with double dealing and violating the discovery order and doing so contumaciously and in bad faith in failing to turn over the reports and statements long before trial. At a subsequent point he said he intended no personal attack on the prosecutor's "ethics, his character or his ability and if this was so construed I owe Mr. Dolan an apology." He explained that the terms contumacious and bad faith were used in the "legal sense" as expressed in the cases. The assistant prosecutor denied there had been any attempt or intent to violate the discovery order. He and the prosecutor had discussed the matter. The prosecutor who had argued the propriety of the order in this Court advised him that the turning over of police reports was never mentioned. They concluded on the basis of the previous state of the law, the practice rule, *R. R.* 3:5–11, *supra,* and the argument of the motion in the trial court and Supreme Court, that such reports were not intended to be included.

After the trial court had indicated disagreement with the State's construction of the order, the assistant prosecutor said:

"* * * I concede that within the framework of the first paragraph of the Order, where it refers to statements, confessions and papers, that is broad enough in the abstract to cover each and every one of these statements which were turned over to Mr. Brown [two days previously]. In any event, this was examined very carefully, this

entire aspect was examined very carefully, before certain documents were turned over to Mr. Brown pursuant to the court order rendered by Judge Convery, and it was our thought at the time — and again I represent to this court that this was not done with any idea of chicanery, of double dealing, of cutting corners, but on the honest conclusion that we were not required to submit to counsel for the defendant police reports rendered during the course of the investigation of the homicide and during the course of guard duty performed by the Highland Park Police and the Sheriff's officers.

We felt then and we felt until two days ago that these reports would be readily available to each of these witnesses as the time for cross-examination approached, and that, of course, would be in complete consonance with the Supreme Court decision in State vs. Hunt, subsequently affirmed in other cases. * * *"

He called to the court's attention further that while he was preparing the case for trial he and Mr. Brown had discussed whether he was required to advise Mr. Brown of any pertinent information communicated to him orally by prospective witnesses, which he had not already furnished the defense. This had resulted in a pretrial motion for a ruling on the matter. After argument the trial judge had sustained the State's position that any such oral statements need not be given defendant in advance of trial. The question of duty to deliver police reports of the nature which later created the mistrial problem was not presented at that time. Even though the court found at the trial that the prosecutor had acted in good faith with respect to these reports, the mistrial probably would have been avoided had he sought a pretrial ruling on the matter.

As the argument proceeded at the trial, the State suggested a recess be taken to enable the defense to make any investigation or further preparation considered necessary as a result of the reports. The assistant prosecutor offered to produce "every one" of the persons who made them at a place convenient for defense counsel so that he could interrogate them privately and without limitation. Mr. Brown declined the offer and advised the court it was impossible to say how much time would be required to do what ought to be done or might develop to be necessary once his investigation had be-

gun. He felt the defense had been prejudiced by the State's disregard of the discovery order, and the prejudice could not be removed by an attempt to do a hasty job of investigating, preparing for and meeting the information revealed by the withheld reports.

Although it is probable that the persons making the reports and the other persons mentioned therein were accessible and many of them known to defense (such as Pinkerton agents, defendant's attorneys, Farmer's company engineer and others who visited him at the hospital), and probably available for interview on short notice, and others such as police officers and prosecutor's representatives could have been produced quickly for interrogation, it cannot be said in fairness or with any degree of certainty that forcing a recess and such a course of hasty preparation upon the defense would have been consistent with the due administration of justice. The trial judge, who was fully acquainted with all the facts and circumstances, felt it would be unfair to defendant to push him into a trial recess and an immediate investigation, and that his interests required a more protective course of action. He indicated a feeling also that to continue the trial, requiring defendant to meet as best he could the material covered by the police reports, would probably result in a reversal on appeal if defendant were convicted. On the other hand, since the information contained in the reports was of great importance to the State, particularly on the issue of sanity, to grant defendant's motion to suppress them and any evidence flowing from them would prevent a meaningful trial and probably result in a judgment of acquittal at the close of the prosecution's case or in a jury verdict of acquittal.

Inquiry by the court for the parties' views about a mistrial revealed opposition by the State. Likewise, the defendant, who had insisted earlier that he wanted a mistrial if the reports were not furnished to him before the trial proceeded any further, now having received and examined them, opposed a mistrial, as well as the proposed recess to permit investigation, and continued to press his motion to suppress them.

After a recess, the judge declared he was satisfied the failure of the State to submit the reports to the defendant was the result of a misinterpretation of the discovery order and not a deliberate attempt to deny defendant the information contained therein. He went on to announce his conviction (1) that it would not be practical to recess the trial to permit time for investigation of the reports and preparation by the defendant to meet them, (2) that to strike the evidence revealed by them would prevent a "meaningful trial," and (3) that to allow the case to proceed without excluding that evidence would be "completely" unfair to the defendant. Accordingly, over objection of both defendant and the State he was "reluctantly" declaring a mistrial.

A few weeks later defendant moved for a dismissal of the indictment on the ground that a new trial would place him in double jeopardy in violation of the Fifth Amendment to the *United States Constitution,* and of *Article* I, *paragraph* 11 of the *New Jersey Constitution.* The motion was denied in a written opinion in which the trial judge reiterated his belief that the prosecutor had acted in good faith in interpreting the discovery order. He declared further that, even though the prosecutor's interpretation was erroneous and must be regarded as the producing cause of the mistrial, under all the circumstances of the case it would not be fundamentally unfair to require retrial of the defendant.

I

■ One of the most basic rights possessed by the people of this State and of the United States is freedom from being put in jeopardy a second time for the same criminal offense. *State v. Roller,* 29 *N. J.* 339 (1959). This principle, which grew into the common law and became rooted in tradition and conscience, was embodied in our *Constitutions of* 1844, *Art.* I, *par.* 10, and of 1947, *Art.* I, *par.* 11. Both paragraphs prohibit the trial of a person after acquittal for the same offense. The Fifth Amendment to the United States Constitution ex-

168

presses the common law prohibition in more general terms, *i. e.*, "* * * nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." In the light of historical evolution and treatment, the difference in language in the context of the present case is without distinction in meaning. The clauses are coextensive in application. *State v. Wolf*, 46 *N. J.* 301 (1966); *State v. Williams*, 30 *N. J.* 105 (1959).

The State contended and the trial court agreed, citing *Brock v. State of North Carolina*, 344 *U. S.* 424, 73 *S. Ct.* 349, 97 *L. Ed.* 456 (1952), that the double jeopardy provision of the Fifth Amendment applies only to the Federal government and operates on criminal prosecutions within that sphere alone. Assuming the contention were correct it would be of no particular significance. As we have said, the provisions of the two Constitutions, State and Federal, noted above, are coextensive in principle and scope, and so the views of the United States Supreme Court on double jeopardy, even if not controlling, would be influential and persuasive. *State v. Williams, supra,* 30 *N. J.,* at *p.* 122. Moreover, much water has passed over the dam since *Brock v. State of North Carolina* and in view of the more recent cases in that Court little doubt remains that the double jeopardy clause of the Fifth Amendment is binding on the States by virtue of the Fourteenth Amendment. See, *Mapp v. Ohio,* 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed. 2d* 1081 (1961); *Gideon v. Wainwright,* 372 *U. S.* 335, 83 *S. Ct.* 792, 9 *L. Ed. 2d* 799 (1963); *Griffin v. State of California,* 380 *U. S.* 609, 85 *S. Ct.* 1229, 14 *L. Ed. 2d* 106 (1965), and concurring opinion of Justice Harlan, 380 *U. S.,* at *pp.* 615–617, 85 *S. Ct.,* at *pp.* 1233–1234 (1965); *Miranda v. State of Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed. 2d* 694, 717 (1966). Although these cases do not involve the double jeopardy clause, they clearly reveal a disposition on the part of the Court to regard protection of all of the basic rights encompassed by the Fifth Amendment as the inescapable obligation of both State and Federal sovereignties.

■ In order for the defense of double or former jeopardy to be available to an accused, it is not necessary that the previous criminal trial terminate in a verdict of not guilty. The term "acquittal" in our Constitution has a much broader significance. Under well-established principles, jeopardy attaches to a defendant when he is put on trial in a court of competent jurisdiction upon a valid indictment and a jury is impaneled and sworn to determine the issue of his guilt or innocence of the crime charged. Thereafter, ordinarily, he is entitled to have the trial proceed to its normal conclusion, *i. e.,* judgment by the court or verdict of the jury. If the jury is discharged before that time without his consent or without legal justification, the abortive ending is equivalent to acquittal and bars retrial. *State v. Romeo,* 43 *N. J.* 188 (1964) ; *State v. Williams, supra; State v. Locklear,* 16 *N. J.* 232 (1954).

■ The requirement for completion of a trial once begun is not an inexorable one, admitting of no qualifications or exceptions. The rule against double jeopardy does not signify that every time a defendant is put on trial before an appropriate court he is entitled to go free if the trial falls short of final judgment. Such a doctrine, the United States Supreme Court said in *Wade v. Hunter,* 336 *U. S.* 684, 69 *S. Ct.* 834, 93 *L. Ed.* 974 (1949), would create an insuperable obstacle to the administration of justice in many cases where there is no semblance of the oppressive practices at which the double jeopardy provision is aimed. It was recognized there that in some unusual instances a defendant's right to have his trial completed by a particular tribunal must be subordinated to the public interest in fair trials designed to end in just judgments. 336 *U. S.,* at *pp.* 688–689, 69 *S. Ct.,* at *pp.* 836–837. In *Wade* the Court quoted as follows from *United States v. Perez,* 22 *U. S.* (9 *Wheat.*) 579, 580, 6 *L. Ed.* 165, decided in 1824, which has been regarded ever since as establishing the test for determining whether an early termination justifies a plea of double jeopardy:

"* * * We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office. * * *" 336 *U. S.*, at *pp.* 689–690, 69 *S. Ct.*, at *p.* 837.

In succeeding years since *Perez,* the rubric of "manifest necessity," by which the exercise of a trial judge's discretion in granting a mistrial without defendant's consent was to be tested, has been expressed in varied ways. Discontinuance of a trial is proper if under the circumstances the "ends of justice will be best served" thereby; if "[j]ustice to either or both parties [indicates] to the wise discretion of the trial judge that he declare a mistrial and require the defendant to stand trial before another jury." *Brock v. State of North Carolina, supra,* 344 *U. S.,* at *p.* 427, 73 *S. Ct.,* at *p.* 351; if the circumstances satisfy the dispassionate judgment of the trial judge that an "urgent necessity" exists for a mistrial and the ends of public justice will be accommodated; *Wade v. Hunter, supra,* 336 *U. S.,* at *pp.* 690–691, 69 *S. Ct.,* at *pp.* 837–838; if the circumstances convince his sensitive and experienced judgment that an "imperious necessity" for discontinuing the trial has come into being; *Downum v. United States,* 372 *U. S.* 734, 736, 83 *S. Ct.* 1033, 10 *L. Ed. 2d* 100, 102 (1963); if the circumstances create an "absolute or an overriding necessity" or "sufficient legal reason" for the mistrial; *State v. Locklear, supra,* 16 *N. J.,* at *p.* 243. The important and relevant conclusion to be drawn from the cases is that no hard and fast or mechanistically applied rule exists

which compels a finding of double jeopardy whenever a criminal trial in progress is discontinued, or which suggests that every time such a trial begins, the defendant is entitled to go free if the trial does not end in a final judgment. *Gori v. United States,* 367 *U. S.* 364, 81 *S. Ct.* 1523, 6 *L. Ed. 2d* 901 (1961). A wide range of discretion is recognized in the trial judge, who has his finger on the pulse of the proceedings. If in his judgment emergent conditions come into being which persuade him that the ends of justice for the defendant and the State cannot be achieved without aborting the trial, neither the Federal nor the State Constitution proscribes such an order. This is particularly true where the circumstances which to him compel the order do not bespeak bad faith or oppressive conduct by the prosecution or a desire or effort to improve the chances of conviction at a subsequent trial. See *United States v. Tateo,* 377 *U. S.* 463, 468, *fn.* 3, 84 *S. Ct.* 1587, 12 *L. Ed. 2d* 448, 452 (1964). In this sensitive area appellate courts must realize that under our system the conduct of a trial is committed to the trial judge, and that in appraising the exercise of his discretionary action a wise and tolerant restraint must be practiced if the separate levels of the judicial process are to be maintained. And appellate reluctance to interfere with a *sua sponte* declaration of a mistrial should be even more pronounced where it is plain that a primary motive for the trial judge's course was solicitude for the defendant's interests. *Gori v. United States, supra; Scott v. United States,* 91 *U. S. App. D. C.* 232, 202 *F. 2d* 354 (*D. C. Cir.* 1952) ; *United States v. Giles,* 19 *F. Supp.* 1009 (*W. D. Okla.* 1937).

Obviously there can be no cataloguing of events or conduct which, without more, will require a holding of double jeopardy when a mistrial is ordered without the defendant's consent. The circumstances must be examined with a mind conscious of the trial milieu and the fact that its atmosphere, vagaries, emotional stimuli and urgency of decision only rarely can be captured in a cold appellate record. They must be looked at also with an awareness that a person accused of

crime has no natural constitutional right to be exempted from those procedural practices which are deemed necessary in the effort of the State to make sure that the conduct and final result of a trial shall be in accordance with law and justice to all defendants and to the public.

As we have already noted, the order in this case by its terms authorized a further intrusion into the prosecutor's file than had been permitted previously in New Jersey. It was contrary to pre-existing case law as well as to the specific limitation of *R. R.* 3 :5–11. In fact, we are aware of no jurisdiction where such broad discovery has been sanctioned. See, *Louisell, Criminal Discovery: Dilemma Real or Apparent,* 49 *Cal. L. Rev.* 56 (1961). Moreover, it may be said with some sheepishness that the practically unlimited scope of the order was not made the subject of oral or written argument on the application for leave to appeal therefrom. As indicated later in *State v. Tate, supra,* 47 *N. J.,* at *p.* 355, the direction of the argument was toward achieving accessibility to grand jury testimony and statements taken by the police from persons other than the defendant which would aid him in "reconstructing the criminal event." It is likewise fair to say on the basis of the record at that time that no one was thinking in terms of post-event reports of police guards at the hospital concerning defendant's conduct there, unrelated to the circumstances surrounding the shooting. But, be that as it may, the prosecutor consented to the *form* of the order as prepared by defense counsel without seeking specificity, and must be considered bound by it. This is said, not in criticism of defense counsel, nor to excuse the State's misinterpretation, but by way of understanding the prosecutor's limited compliance. Prior to trial the prosecutor read the order in light of what he believed to be its intended extension of existing case law and rule of practice. The trial court found that in doing so he acted in good faith and we accept that finding. At the trial, defense counsel read the order in light of the compass of its language. He was entitled to do so, and the trial court was correct in accepting his construction.

██ The problem caused by the State's good faith error came after the jury had been selected and sworn, but it arose on the morning of the first day devoted to the presentation of evidence. Two police witnesses had testified and a third officer was on the stand. Up to this point the testimony had been largely introductory. Once the trial judge concluded that the State's limited view of the discovery order was incorrect, and the defendant was therefore entitled to the substantial number of papers which had not been delivered, he was faced with a dilemma requiring resolution of certain alternatives: (1) If the assistant prosecutor declined to turn over the reports before the trial proceeded further with the introduction of proof, defense counsel would have pressed his motion for a mistrial. Obviously both the court and the State wanted to avoid such a result if possible, and so the recess was taken to permit the delivery. (2) When this had been done and the trial resumed, defendant no longer spoke in terms of a mistrial; undoubtedly if the motion had been pursued, denial thereof would have been error. Instead he demanded suppression of the reports. A further recess could have been ordered for a time fixed to enable defendant to investigate and prepare to meet the additional evidence. The court believed this course to be impractical and unfair to the defendant (particularly since the jury was sequestered) because it could not be estimated with any degree of probability what time would be required reasonably for the purpose. Assuming we felt, in view of the nature of the information in the reports, that a recess for a reasonable period was worthy of a try, we would refrain from expressing such an opinion now, for to do so would be an unwise invasion of the wide scope of discretion intrusted to the trial judge. (3) Since defendant opposed a recess for investigation purposes, the court could have denied his motion to suppress the reports and directed the trial to proceed, thus requiring the defendant to meet the proof as best he could. This action would have been egregiously unfair to defendant. If conviction followed, reversal on appeal would be virtually certain. Compare, *Logan*

*v. United States,* 144 *U. S.* 263, 12 *S. Ct.* 617, 36 *L. Ed.* 429
(1892). (4) If the motion to suppress the reports and the
proof emanating from them were granted, in the face of the
State's intention to rely on lay testimony (*i. e.,* that of the
hospital guards) to overcome the claim of insanity at the time
of the shooting, an acquittal would almost certainly result.
After full argument and considerable deliberation, the ex-
perienced trial judge concluded that the only reasonable solu-
tion fair to the defendant and to the State would be to dis-
continue the trial and set the case down for retrial after such
interval as would permit the defendant to study and investi-
gate the withheld reports. We are satisfied from our examina-
tion of all the facts and circumstances that his reluctant
declaration of a mistrial constituted a reasonable exercise of
judicial discretion, and that it represented the most sensible
balancing of the interests of the defendant and the public.
We have no doubt it came from a conscience acutely aware not
only of the sacredness of the life at stake before him, but also
of the sacredness of the life that was taken.

As we have noted above, the double jeopardy pro-
tection does not mean that once an accused has been put on
trial regularly, the proceeding must run its ordinary course
to judgment of conviction or acquittal. The rule does not
operate so mechanistically. If some unexpected, untoward and
undesigned incident or circumstance arises which does not
bespeak bad faith, inexcusable neglect or inadvertence or op-
pressive conduct on the part of the State, but which in the
considered judgment of the trial court creates an urgent need
to discontinue the trial in order to safeguard the defendant
against real or apparent prejudice stemming therefrom, the
Federal and State Constitutions do not stand in the way of
declaration of a mistrial. And this is true even if the con-
scientious act of the trial judge may be characterized as the
product of "extreme solicitude" or "overeager solicitude" for
the accused. See, *Gori v. United States, supra,* 367 *U. S.,* at
*p.* 367, 81 *S. Ct.,* at *p.* 1525. Moreover, if an incident or cir-
cumstance of that nature moves the court to order a mistrial

not only to safeguard the right of the defendant to a full and fair trial, but also to protect the right of society to have its trial processes applied fully and fairly in the due administration of the criminal law, there is even less basis for a claim of trespass upon the privilege against double jeopardy. See, *A. L. I. Proposed Official Draft, Model Penal Code* (1962) § 1.08. Clearly the societal right to have the accused tried and punished if found guilty stands side by side with the right of the accused to be prosecuted fairly and not oppressively. While the public right, when it must be considered alone, may not weigh as heavily in the scale as that of the defendant because of the constitutional dimensions of the privilege against double jeopardy and the superior capacity of the State to investigate and prepare for prosecutions, nevertheless when exercise of the trial court's discretion may fairly be said to serve both interests, there is certainly less substantial reason to question its propriety.

There can be no doubt that the primary motive for the mistrial here was a sincere effort on the court's part to protect and assist Farmer. Clearly that purpose has been served because with possession of the police reports and the information given to him in the *voir dire* examination of the prospective jurors at the two abortive trials as to the means by which the State expects to meet the defense of insanity, he has full knowledge of the strength and weakness of the case against him, and ample opportunity to prepare for it. *Cf. United States v. Gori,* 282 *F. 2d* 43, 48 (2 *Cir.* 1960), affirmed 367 *U. S.* 364, 81 *S. Ct.* 1523, 6 *L. Ed. 2d* 901. On the other hand, there is no suggestion that the State acted as it did to foster a mistrial and thus in some way to improve its position. The public was benefited only by being allowed to retain its right to go to trial again without loss of what appears to be its only evidence in opposition to the claim of insanity. To equate the mistrial with an acquittal is to vest defendants in cases like this with a veto power over such action by trial judges and to deprive judges of a measure of discretion which

has been a traditional and essential component of courtroom control.

If the court had not construed the discovery order as requiring delivery of the police reports to defendant and the trial had proceeded to a conviction, undoubtedly a reversal would have ensued on appeal. If after receiving the reports defendant had been directed to continue at once with the trial, and he had been convicted, it is virtually certain that the same result would have followed on appeal. In this event a new trial would be ordered, and a claim of double jeopardy would be without merit. It would be anomalous, therefore, to hold that when the defendant declines the State's offer of recess and the production of the witnesses making the reports for his *in camera* interrogation, and declines also an offer of recess to permit any investigation made necessary by the reports, and insists on suppression of the reports and any evidence flowing therefrom, which means emasculation of an essential part of the State's case, the only choices open to the court are (1) to incur the likelihood of reversible error by proceeding, (2) to make an acquittal inevitable, or (3) to order a mistrial which will bring into operation the double jeopardy bar against retrial. Such a ruling would mean that, in spite of this kind of good faith error on the part of a representative of the State, and a conscientious effort by the court to protect the defendant against possible prejudicial consequences of the error, command of the situation passes to the defendant and he can either force the court to commit reversible error or, by means of asserted opposition to a mistrial, in effect confer immunity upon himself if the mistrial is granted. That indeed would be a high price to require society to pay for a good faith mistake of a prosecutor and an honest effort by a court to safeguard the defendant and the public from its consequences.

If a mistrial of the nature now before us were to be equated with an acquittal, the psychological impact on trial judges would probably motivate them against such action in the future unless the defendant requests it or consents to it.

If the defendant does not so move or give his consent, the judges may consider it preferable to allow the trial to run its course to the probably reversible conclusion and permissible retrial, rather than to immunize the defendant by ordering a mistrial. See Note, "Double Jeopardy: The Reprosecution Problem," 77 *Har. L. Rev.* 1272, 1279–1281 (1964). This would be an understandable (though neither a healthy nor desirable) result. Obviously a defendant is no less wronged by a finding of guilt after an unfair trial than by a mistrial order opposed by the State and the defendant and not made necessary by an intentional effort by the prosecutor to obtain an unfair and oppressive advantage, but conscientiously believed necessary by the trial judge to protect both the defendant's and the public's interest. A distinction between the two "affords no sensible basis for differentiation with regard to retrial." *United States v. Tateo, supra,* 377 *U. S.,* at *p.* 467, 84 *S. Ct.,* at *p.* 1589. Judicial inaction at the trial level, whether through a felt impotence or even excessive caution, in the face of a plain need to meet a trial challenge such as was presented here would probably do the administration of criminal justice more harm than the granting of a mistrial.

Since there is no over-all formula, no hard and fast rule for determining when an order of mistrial will cause the jeopardy bar to spring into being, each case must depend upon its own facts and the urgency of its circumstances. And as might be expected, therefore, no case has been cited to us which presented to the trial court an emergent situation like this one.

In *Wade v. Hunter, supra,* Wade, an American soldier with the combat forces in Germany in World War II, was charged with rape. When he was put to court martial trial, the troops had advanced a considerable distance from the scene of the crime. Nevertheless the trial proceeded, the evidence was heard, arguments of counsel made, and the court martial closed to consider the case. Later the same day the trial was reopened and an announcement made that it would be con-

tinued until a later date in order to hear some additional witnesses. A week later the Commanding General withdrew the charges from the court martial, directing it to take no further proceedings. The General then transmitted the charges to the Commanding General of the Third Army, recommending trial by a new court martial. The reason given was that two witnesses, father and mother of the rape victim, were unable to be present because of illness, and the trial had been continued so their testimony could be taken. The General noted also that, because of the "tactical situation" of his command and its considerable distance from the residence of the witnesses, the court martial could not be completed within a reasonable time. The Third Army General, finding his tactical situation to be similar, in turn forwarded the matter to the Commanding General of the Fifteenth Army, who convened the court martial. At this time Wade pleaded that he could not be tried again as he had been put in jeopardy by the first court martial. The plea was denied, and after his conviction the matter ultimately reached the United States Supreme Court.

In rejecting the defense, Justice Black, writing for the Court, declared that the double jeopardy provision of the Fifth Amendment does not mean that every time a defendant is put to trial in a proper court he must go free if the proceeding fails to end in a final judgment. "Such a rule would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed." 336 *U. S.*, at *pp.* 688–689, 69 *S. Ct.*, at *p.* 837. It was said further that a defendant's right to have the trial go to final judgment must on occasion be subordinated to the "public's interest in fair trials designed to end in just judgments"; and that a rigid rule banning discontinuance of a trial because of absence of witnesses, come what may, was not acceptable. Such a rule would be inconsistent with the guiding principles of *United States v. Perez, supra,* "to which we adhere," namely that whether justice requires discontinuance

of a particular trial should be decided by "persons conversant with factors relevant to the determination." 336 *U. S.*, at *p.* 689, 69 *S. Ct.*, at *p.* 837. It is obvious that the Court was referring to trial judges, and reiterating the view of *Perez,* "[which] has been the basis for all later decisions [of the Supreme Court] on double jeopardy," *i. e.*, that such judges have the right to order a mistrial when, in the conscientious exercise of their discretion, particular circumstances manifest a necessity for so doing and failure to do so would defeat the ends of justice. 336 *U. S.*, at *p.* 690, 69 *S. Ct.*, at *p.* 838. See also, *Lovato v. State of New Mexico*, 242 *U. S.* 199, 37 *S. Ct.* 107, 61 *L. Ed.* 244 (1916); *Brock v. State of North Carolina*, 344 *U. S.* 424, 73 *S. Ct.* 349, 97 *L. Ed.* 456 (1952), decided in terms of the Fourteenth Amendment; *United States v. Tateo*, 377 *U. S.* 463, 84 *S. Ct.* 1587, 12 *L. Ed. 2d* 448 (1964); *United States v. Giles*, 19 *F. Supp.* 1009 (*W. D. Okla.* 1937); *Scott v. United States*, 91 *U. S. App. D. C.* 232, 202 *F. 2d* 354 (*D. C. Cir.* 1952).

The two most recent cases in the United States Supreme Court are *Gori v. United States*, 367 *U. S.* 364, 81 *S. Ct.* 1523, 6 *L. Ed. 2d* 901 (1961), and *Downum v. United States*, 372 *U. S.* 734, 83 *S. Ct.* 1033, 10 *L. Ed. 2d* 100 (1963). Gori had been indicted for knowingly receiving goods stolen in interstate commerce. A jury was impaneled and government evidence was introduced throughout the morning and was continuing in the afternoon when a situation arose which in the trial judge's opinion required a mistrial. The case was retried later over defendant's double jeopardy objection and he was convicted. The conviction was sustained in the Court of Appeals for the Second Circuit, 282 *F. 2d* 43 (1960), and by the United States Supreme Court.

The incident which provoked the mistrial was not very clear from the record. Apparently, while one of the prosecution witnesses was being questioned on direct examination, the trial court got the impression that the government attorney was endeavoring to insinuate to the jury that the defendant had been convicted of other crimes. 282 *F. 2d*, at *p.* 46. Actu-

ally no such question was put specifically, nor did the cold appellate record reveal clearly that such was the intention of the United States attorney. The parties agreed, however, that the mistrial was declared pursuant to the trial judge's intention to prevent evidence of other crimes by the accused. The Court of Appeals observed that the trial court should not have acted so hastily, but should have awaited a definite question which would have permitted a clear-cut ruling. Judge Clark pointed out that the Federal system takes pride in the fact that its judges are not mere automatons or referees, but bear an affirmative responsibility for the proper conduct of a criminal trial. And he indicated that, even though it may appear in a rare case that a judge in ordering a mistrial may have been overzealous in his protection of the rights of an accused, the law is better served by continued acceptance of the constitutional propriety of a conscientious exercise of his discretion in declaring a mistrial.

The Court concluded with a statement pertinent to the present case:

"Here the defendant was in no way harmed by the brief trial which, indeed, revealed to him the prosecution's entire case. He was thus in a position to start anew with a clean slate, with all possibility of prejudice eliminated and with foreknowledge of the case against him. The situation was quite unlike the more troublesome problems found in various of the cases, as where the prosecution desires to strengthen his case on a new start or otherwise provokes the declaration of mistrial, or the court has acted to the prejudice of the accused, or the accused has actually been subject to two trials for essentially the same offense. On the other hand, for the defendant to receive absolution for his crime, later proven quite completely, because the judge acted too hastily in his interest, would be an injustice to the public in the particular case and a disastrous precedent for the future." 282 *F. 2d*, at *p*. 48.

On *certiorari* the United States Supreme Court affirmed. The majority opinion described the case as one in which, viewing it most favorably to the accused, the mistrial order "was found neither apparently justified nor clearly erroneous" by the Court of Appeals. Reference was made to the necessarily wide range of discretion which is and must continue to be

vested in trial judges in this area of trial practice. It was said also that "Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment." 367 *U. S.*, at *p.* 368, 81 *S. Ct.*, at *p.* 1526. Finally the Court indicated that error of constitutional dimensions could not be found on the record presented; it "would not thus make [trial judges] unduly hesitant conscientiously to exercise their most sensitive judgment—according to their own lights in the immediate exigencies of trial—for the more effective protection of the criminal accused." 367 *U. S.*, at *p.* 369, 81 *S. Ct.*, at *p.* 1527.

In *Downum v. United States, supra,* the Court reached the opposite conclusion as to the effect of a mistrial, but in a different factual setting. Downum had been charged in six counts of an indictment with forging and passing government checks, and with conspiring with two codefendants (who pleaded guilty) to commit those acts. During the week previous to the mistrial, 12 cases, including Downum's, were set for trial the following Monday. The trial judge commented later that this was "very short notice." The cases involved about 100 witnesses, and subpoenas had been issued to the marshal for service. The Downum case was number 10 on the list, and the prosecutor did not expect it to be reached on Monday or Tuesday. On Monday afternoon the marshal advised the prosecutor he had learned that the wife of the key witness on two of the counts in the indictments would inform them of her husband's whereabouts "if she should learn of it." When Downum was called on Tuesday morning, the prosecutor, who was then trying another case, marked it ready without ascertaining from the marshal whether the particular witness was in court. A jury was selected and then excused until 2:00 P. M. so the prosecutor could complete the case on trial. Upon checking with the

marshal's office during the noon recess, the prosecutor learned the witness was not present. He immediately informed the judge in chambers, and at the opening of the afternoon session defense counsel was advised of the missing witness and that the case would have to go over for a few days. Defendant thereupon moved to dismiss the two counts of the indictment involving that witness for lack of prosecution, and to require the trial to proceed on the remaining counts. The trial court denied the motion, and discharged the jury over the defense objection.

Two days later the case was called again and the defendant pleaded double jeopardy. The plea was rejected, the trial proceeded and resulted in a conviction on all counts involving Downum. The Court of Appeals for the Fifth Circuit agreed that the first abortive proceeding, at which nothing was done beyond selection and swearing of the jury, did not justify application of the Fifth Amendment to bar the later completed trial. It held the trial court had not abused its discretion under the circumstances in ordering the mistrial. 300 F. 2d 137 (5 Cir. 1962).

On *certiorari,* the United States Supreme Court reversed by a five-to-four vote. It took the view that the situation was simply one where the prosecutor had entered upon the trial of the case without sufficient evidence to convict. At the end of a short opinion Justice Douglas said tersely that any doubt as to what rule should be applied in such a situation would be resolved by the majority "in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain, and arbitrary judicial discretion." 372 *U. S.,* at *p.* 738, 83 *S. Ct.,* at *p.* 1035. We do not take this language in its context to signify an intention to deny in the future the existence of any judicial discretion to grant a mistrial during the course of a criminal trial.

This decision apparently represents the first time since the adoption of the Federal Constitution that the United States Supreme Court interfered with the determination of a trial court that justice required a mistrial, and held that

in granting the mistrial it had abused its discretion. (See, Note, "Double Jeopardy, The Reprosecution Problem," *supra*, 77 *Har. L. Rev.*, at *p.* 1277). The result is the most extreme recorded example of application of the double jeopardy bar that has been brought to our attention, and raises considerable question as to the extent to which it has drawn in the long recognized perimeter of the trial judges' discretionary control over the conduct of criminal trials. In any event, the case is probably a binding precedent on this Court and we accept our obligation to follow it in the same or indistinguishable fact pattern. It may be noted, however, that *Downum* did not criticize or overrule *Gori v. United States;* moreover, it adhered to the principle that in deciding whether the jeopardy bar is to be applied, each case must turn on its own facts. 372 *U. S.*, at *p.* 737, 83 *S. Ct.*, at *p.* 1035.

The present case is distinguishable from *Downum*, and brings facts to us which, in our judgment, are even more influential against application of the double jeopardy doctrine than those in *Gori*. Or, put in terms commonly found in the cases, the unusual facts and circumstances here clearly provided a reasonable basis for the trial judge to conclude that an urgent need existed to abort the trial in the interest of the defendant and the State. As we have already explained, the unusual and novel discovery order must be considered in the ambiance of its time. The prosecutor's interpretation of it was too narrow when measured by its language. His construction, however, found as it was by the trial court to have been made in good faith, though erroneous, was not without some basis in reason when related to the arguments of the parties to the various courts which considered the discovery motion. The arguments dealt almost exclusively with the desirability of extending the established scope of discovery to the statements of witnesses other than the accused in order to enable him to reconstruct the criminal event. That the prosecutor believed this was the purport of the order is indicated by the delivery, months before the trial began, of the entire 274-page transcript of the grand jury testimony covering circumstances

preceding, surrounding and immediately after the homicide incident. It is shown also by the delivery at the same time of the comprehensive statements obtained from the persons who appeared before the grand jury, as well as notes of interviews with six other persons who shed light on the relations between Farmer and his wife prior to the shooting. When at the early stage of the trial the court decided there had been incomplete compliance with the discovery directive, it is plain that the principal deficiency was considered to be the failure to turn over the reports of the police officers who had guarded Farmer's hospital room for days after the homicide. This was because the testimony derived from those reports represented in large part the basis upon which the State expected to rebut the defense of insanity. Although satisfied that the prosecutor had acted in good faith, the trial court felt in all good conscience that it would "be completely unfair" to the defendant to force him to proceed with the trial without giving him an opportunity to investigate and prepare to meet this lay proof of sanity. Also in view of the good faith determination, the court felt it would be transgressive of the public interest to suppress the testimony and thus in all probability produce an acquittal. The dilemma facing him was aggravated by the awareness that to force defendant to continue the trial and meet the lay rebuttal testimony as best he could would result in virtually certain reversal, if conviction ensued. The pressure of all the circumstances led him to conclude that mistrial was the only just solution for the defendant and the public. That solution, born of the unusual trial travail, should not be considered so unreasonable by a reviewing court as to constitute an abuse of discretion.

In short, here, as in *Gori,* the defendant has not suffered any substantial prejudice because of the mistrial. He now has foreknowledge of the substance of the State's case against him, and ample time to prepare to meet it. Moreover, as the trial court found, the mistrial was not caused by any intention of the prosecution to take an undue advantage, or to oppress Farmer in his effort to defend himself.

Accordingly, the interlocutory order of the trial court rejecting the defense of double jeopardy is affirmed, and the cause may be listed for trial.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN — 6.

*For reversal* — None.