SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Stephen A. Zadroga** (A-22-22) (087156)

**Argued April 25, 2023 -- Decided August 9, 2023**

**WAINER APTER, J., writing for a unanimous Court.**

The Court considers whether double jeopardy bars the retrial of defendant Stephen A. Zadroga under the circumstances of this case.

In November 2017, two cars collided head-on in Jersey City.  Defendant was driving 85-88 miles per hour 3 seconds before the crash; the posted speed limit was 25.  In addition to witnesses' statements about the speed at which defendant was driving, there was evidence that his car was over the yellow lines, into opposing traffic, at the time of the collision.  Defendant's best friend died in the crash.

Pursuant to a warrant, the State seized and tested what they thought was defendant's blood.  The blood alcohol content (BAC) came back as 0.376%, more than four times the legal limit.  Relying on that evidence, the grand jury charged defendant with aggravated manslaughter, death by auto, and three counts of driving while intoxicated.

After the nurse who drew defendant's blood testified for the State at trial, the State realized that the blood they believed to be defendant's had actually come from a person who had died seven months before the accident.  After the State discovered the error, defendant moved to dismiss the indictment with prejudice because the grand jury had relied on false testimony to indict him.

The trial court granted defendant's motion as to the counts of driving while intoxicated but denied the motion as to counts one and two, aggravated manslaughter and death by auto.  The court found that allowing defendant to be retried on the counts unrelated to intoxication would not violate his rights under the Double Jeopardy Clause both because he consented to the trial's termination and because there was a manifest necessity to terminate the trial.  The Appellate Division affirmed on manifest necessity grounds, adding that while the State could present counts one and two to a new grand jury, it could not present any evidence that defendant was under the influence of alcohol at the time of the collision.  472 N.J. Super. 1, 8 (App. Div. 2022).  The Court granted certification.  252 N.J. 325 (2022).

1

**HELD:** The trial court did not abuse its discretion in finding manifest necessity justified a mistrial here. As the Appellate Division held, the State can present the counts of aggravated manslaughter and death by auto to a new grand jury based solely on the reckless driving evidence, without any evidence on intoxication.

1. Both the United States and the New Jersey Constitutions protect defendants from repeated prosecutions for the same offense. Jeopardy attaches after a jury is impaneled and sworn, and double jeopardy protects the right of the defendant to have his trial completed before the first jury impaneled to try him. However, termination of a trial after jeopardy attaches does not necessarily prohibit subsequent re-prosecution. Only the improper termination of proceedings bars retrial. Termination can be proper, and a retrial not barred by double jeopardy principles, in two circumstances. First, termination is proper and there is no bar to retrial if there is a "manifest necessity" to terminate the proceedings. State v. Loyal, 164 N.J. 418, 435 (2000). The manifest necessity standard protects "the defendant's interests in having his case finally decided by the jury first selected while at the same time maintaining 'the public's interest in fair trials designed to end in just judgements.'" Oregon v. Kennedy, 456 U.S. 667, 672 (1982). There are no rigid rules as to what constitutes a manifest necessity. Instead, the Court has set forth several considerations for courts to use in determining whether a manifest necessity requires a mistrial. Loyal, 164 N.J. at 437. Second, when the defendant requests or otherwise consents to a mistrial, manifest necessity need not be shown. Instead, termination is not improper and there is no bar to retrial as long as the prosecutor did not "'goad' the defendant into moving for a mistrial." Kennedy, 456 U.S. at 673, 676. The Court adopted the Kennedy standard in State v. Gallegan, 117 N.J. 345, 357-58 (1989). In 1978, the Legislature chose to codify constitutional double jeopardy protections. See N.J.S.A. 2C:1-9(d). (pp. 19-24)

2. Here, the trial court did not abuse its discretion in finding that termination of the trial was supported by a manifest necessity. The Court disagrees with defendant's reading of State v. Farmer, 48 N.J. 145 (1966), to preclude a finding of manifest necessity if the State acted in bad faith or was guilty of inexcusable neglect. Four features of Farmer make clear that it did not categorically bar retrial even if there is a finding that the State's conduct reflected bad faith or inexcusable neglect. First, Farmer acknowledges that "there is no over-all formula, no hard and fast rule for determining when an order of mistrial will cause the jeopardy bar to spring into being, [and so] each case must depend upon its own facts and the urgency of its circumstances." Id. at 177. Second, Farmer emphasizes the "wide range of discretion" in finding a manifest necessity "recognized in the trial judge, who has his finger on the pulse of the proceedings." Id. at 171. Third, Farmer twice explains that appellate courts should not find an abuse of discretion where the trial court declares a mistrial to protect a defendant's interests. Fourth, the Farmer Court acknowledged that a declaration of manifest necessity must balance "the right of the

2

accused to be prosecuted fairly and not oppressively" against "the societal right to have the accused tried and punished if found guilty." Id. at 175. The Court does not read Farmer to establish a per se rule that, whenever a mistrial follows the State's bad faith or inexcusable neglect, retrial is barred on all counts. The Court also declines defendant's invitation to create such a rule. Application of the fact-specific balancing tests set forth in Farmer and Loyal, which weigh all circumstances and consider both the public's interest and the defendant's rights, is the best course when the State's non-intentional misconduct leads to a mistrial. (pp. 24-28)

3. The trial court did not abuse its discretion in balancing those interests here. First, once the trial judge held that the grand jury relied heavily on defendant's 0.376% BAC level, he did not abuse his discretion in finding "no viable alternative to a mistrial." Second, the trial judge based his decision not on a concern that the State would be prejudiced by continuing with the trial, but by a desire to avoid prejudicing the defendant by forcing him to continue with a trial when the grand jury may have based its decision to indict on false testimony, and when defendant therefore may not have been indicted at all without the BAC evidence. See Farmer, 48 N.J. at 171. Third, the Court disagrees that allowing a retrial here would confer any unfair advantage on the State. The "essence to the doctrine of jeopardy" is "that the State may not retreat from the field when its case turns sour and then be permitted to sally forth on a future day before a new jury when its case is refreshed and reinforced." Gallegan, 117 N.J. at 346. The State did no such thing here. Fourth, defendant will not suffer any substantial prejudice beyond what is inherent in any trial or retrial after appeal. Fifth, although the trial court found that the State's handling of the blood evidence reflected bad faith and inexcusable neglect, it did not find that the State's conduct was intentional, and defendant concedes that the State did not engage in any intentional misconduct. Finally, as the trial court found, the nature of the crime weighs strongly in favor of retrial on counts one and two. Prohibiting the State from putting forth any evidence or argument that defendant was intoxicated acknowledges the harm the State caused defendant by grossly mishandling the blood evidence. And allowing the State to present the charges of aggravated manslaughter and death by auto to a new grand jury, without evidence of intoxication, recognizes that a human being died in this crash. (pp. 28-33)

4. Because there was no abuse of discretion in finding the mistrial was supported by manifest necessity, the Court does not reach whether defendant consented to the mistrial or his request to depart from the Kennedy standard in cases of consent. (p. 34)

**AFFIRMED and REMANDED to the trial court.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, and FASCIALE join in JUSTICE WAINER APTER's opinion. JUDGE SABATINO (temporarily assigned) did not participate.**

3

SUPREME COURT OF NEW JERSEY
A-22 September Term 2022
087156

State of New Jersey,

Plaintiff-Respondent,

v.

Stephen A. Zadroga,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
472 N.J. Super. 1 (App. Div. 2022).

| Argued | Decided |
|---|---|
| April 25, 2023 | August 9, 2023 |

Scott M. Welfel, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora, Public
Defender, attorney; Scott M. Welfel, of counsel and on
the briefs).

Leonardo Rinaldi, Assistant Prosecutor, argued the cause
for respondent (Esther Suarez, Hudson County
Prosecutor, attorney; Colleen Kristan Signorelli,
Assistant Prosecutor, on the briefs).

Oleg Nekritin argued the cause for amicus curiae
Association of Criminal Defense Lawyers of New Jersey
(Law Offices of Robert J. De Groot, and Ziegler Law
Group, attorneys; Oleg Nekritin and Jason LeBoeuf, on
the brief).

William P. Cooper-Daub, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; William P. Cooper-Daub, of counsel and on the brief).

JUSTICE WAINER APTER delivered the opinion of the Court.

This case arises from a head-on collision on Paterson Plank Road in Jersey City. Defendant was driving 85 to 88 miles per hour three seconds before the crash; the posted speed limit was 25 miles per hour. The winding road had one lane in each direction. There was evidence that defendant's car was over the yellow lines, into opposing traffic, at the time of the collision. Defendant's best friend died in the crash.

Pursuant to a warrant, the State seized and tested what they thought was defendant's blood. The blood alcohol content (BAC) came back as 0.376%, more than four times the legal limit. Relying on that evidence, the grand jury charged defendant with aggravated manslaughter, death by auto, and three counts that explicitly accused defendant of driving while intoxicated in violation of N.J.S.A. 39:4-50.

After the nurse who drew defendant's blood testified for the State at trial, the State realized that the blood they believed to be defendant's had actually come from a person who had died seven months before the accident.

2

Apparently, no detective, prosecutor, or investigator had ever inspected the date of collection or patient number written on the blood vials, both of which demonstrated that it could not have been defendant's blood.

After the State discovered the error, defendant moved to dismiss the indictment with prejudice because the grand jury had relied on false testimony to indict him. The trial court granted defendant's motion as to counts three through five, which were dependent on his driving while intoxicated, but denied the motion as to counts one and two, aggravated manslaughter and death by auto. The court found that although the State's handling of the blood evidence constituted bad faith and inexcusable neglect, allowing defendant to be retried on the counts unrelated to intoxication would not violate his rights under the Double Jeopardy Clause both because defendant consented to the trial's termination and because there was a manifest necessity to terminate the trial. The Appellate Division affirmed on manifest necessity grounds. The Appellate Division added that while the State could present counts one and two to a new grand jury, it could not present any evidence that defendant was under the influence of alcohol at the time of the collision.

Defendant argues that a retrial, even on the counts unrelated to intoxication, is barred by our State Constitution's Double Jeopardy Clause. According to defendant, he did not consent to the mistrial and a manifest

3

necessity to terminate the trial would therefore be required. Yet there can be no manifest necessity, defendant contends, when the State has acted in bad faith or is guilty of inexcusable neglect. In the alternative, defendant maintains that if we find he did consent to the mistrial, we should hold that our State Constitution affords greater protection against double jeopardy than the Federal Constitution and adopt the test articulated by the Pennsylvania Supreme Court in Commonwealth v. Johnson, 231 A.3d 807 (Pa. 2020), rather than the test we have previously applied from Oregon v. Kennedy, 456 U.S. 667 (1982).

Because we conclude that the trial court did not abuse its discretion in finding manifest necessity justified the mistrial here, we affirm. As the Appellate Division held, the State can present the counts of aggravated manslaughter and death by auto to a new grand jury, without any evidence on intoxication. We do not reach defendant's alternative argument.

I.

A.

Because this case was aborted mid-trial, this factual summary is based primarily on the presentation to the grand jury rather than testimony elicited at trial.

4

In the early morning hours of Thursday, November 16, 2017, defendant Stephen Zadroga was driving northbound on Paterson Plank Road in Jersey City after a night out with friends. With him were Evadne Figueroa in the front passenger seat and Matthew Nierstedt, his best friend, in the back seat. As defendant drove northbound, Steven Carvache was driving southbound. Carvache was accompanied by Nicole Krygoski in the passenger seat. The posted speed limit was 25 miles per hour. That section of Paterson Plank Road becomes one lane in each direction with "a lot of curves," divided by a double yellow line.

Detective Tony Espaillat of the Hudson County Prosecutor's Office (HCPO) testified before the grand jury regarding statements he took from various witnesses. According to Espaillat, Figueroa told him that she saw defendant drink two or three beers and two shots of a dark-colored alcohol but did not believe he was intoxicated when she got into his car. She said, however, that she felt "scared" during the ride because defendant was "speeding," and that defendant and Nierstedt "just laughed at her" when she asked defendant to slow down.

Espaillat testified that Venicio Rojas, a driver for a charter bus company, said that he was stopped at a light facing north on Paterson Plank Road at about 1:50 a.m. on November 16, with a Port Authority pickup truck in front

5

of him, and a black Mazda -- defendant's car -- behind him. When the light turned green, the Mazda accelerated past Rojas, passing him on the left side "at a high rate of speed." Leon Sergeant, who was riding in the passenger seat of the Port Authority truck, told Espaillat that defendant tried to pass their vehicle on the right "before the [two] lanes merged into one."

Krygoski told Espaillat that she worked at the Corkscrew Bar in Jersey City and had served Carvache two or three 12-ounce cans of beer before Carvache offered to drive her home. She also stated that she remembered (1) the headlights of another vehicle coming toward them on Paterson Plank Road "really, really fast," (2) Carvache trying to swerve out of the way, and (3) the other car being over the yellow line at the time of the crash.

Detective Joe Bisone, also of the HCPO, testified before the grand jury that computer data from the "black box"[1] of defendant's vehicle showed the vehicle traveling at "85 to 88" miles per hour three seconds before the crash, 68 miles per hour one-and-a-half seconds before the crash, and 43 miles per hour at the moment of impact. Detective Bisone said that black box data was

---

[1] A car's "black box" is a device called the Event Data Recorder, which "records certain technical information about a vehicle's operational performance for a few seconds immediately prior to and during a crash." Bill Canis & David Randall Peterman, Cong. Rsch. Serv., R43651, "Black Boxes" in Passenger Vehicles: Policy Issues 1 (2014), available at https://sgp.fas.org/crs/misc/R43651.pdf.

not available for Carvache's car. However, based on physical evidence from the site and collision reconstruction, Detective Bisone concluded that (1) Carvache's car was traveling at approximately 27 to 33 miles per hour on impact; (2) the collision occurred "predominantly in the southbound lane" -- i.e., Carvache's lane; and (3) before impact, defendant's car had been "straddling the double yellow lines with the front of the Mazda halfway over the line."

Detective Espaillat testified about video evidence showing defendant being served two 12-ounce bottles of beer at the first bar he visited. He also testified that the bartender from the second bar defendant visited said defendant drank about three or four 16-ounce beers and two shots of whiskey. Video footage at the Corkscrew Bar showed Carvache being served four beers between 1:09 and 1:45 a.m. The New Jersey State Police Forensic Lab, Espaillat testified, analyzed blood samples from both defendant and Carvache. According to Espaillat, Carvache's blood alcohol content (BAC) was 0.131% and defendant's was 0.376%.

Nonetheless, no law enforcement or emergency personnel who responded to the crash reported observing any signs that defendant was intoxicated, seeing any alcohol in defendant's car, or smelling alcohol on defendant's breath. No one administered any field sobriety tests to defendant.

7

After the crash, Carvache, Krygoski, Figueroa, and Nierstedt were transported to medical facilities, including Jersey City Medical Center (JCMC), for treatment. Defendant was not arrested. He was released to the custody of his parents, who later brought him to JCMC to be treated for injuries sustained in the crash. JCMC staff took a blood sample from defendant. On November 17, 2017, police obtained a warrant and seized what they thought was defendant's blood from JCMC.

Matthew Nierstedt was pronounced dead at approximately 3 a.m. on November 16, 2017. He was 29 years old.

### B.

Defendant was indicted on five counts: first-degree aggravated manslaughter; second-degree death by auto; and three counts of victim-specific third-degree assault by auto, for injuries sustained by Carvache, Krygoski, and Figueroa. The three assault-by-auto counts explicitly charged defendant with driving while intoxicated in violation of N.J.S.A. 39:4-50. Carvache was not criminally charged.

### C.

Trial began in July of 2019. During opening statements, counsel for defendant told the jury it would hear that defendant's BAC had been 0.376% on the night of the crash. Counsel for the State did not mention defendant's

specific BAC but did argue that defendant had been drinking. The jury then heard testimony from Figueroa that defendant had been drinking and watched video footage of defendant being served alcohol at the first bar.

On July 11, 2019, during the second day of witness testimony, the State called Melissa Rosario, the nurse who had drawn defendant's blood at JCMC. She testified during cross examination, based on the blood draw orders, that she drew two vials of defendant's blood on November 16, 2017. Yet the prosecutor realized he had five vials of what he believed to be defendant's blood in evidence.

Upon inspection, the State noticed that the five vials of blood were labeled "John Doe," with a collection date of April 4, 2017, and a patient number that did not match any of the patient identification numbers on defendant's JCMC medical records. The State sent detectives to the hospital on July 12, 2019. The investigation revealed that the five vials of blood the State collected from JCMC on November 17, 2017, had come from a patient who was admitted to the hospital in April of 2017 and died shortly thereafter. Defendant's blood sample had been irretrievably lost.

Apparently, throughout the entire process of the Hudson County Prosecutor's Office seizing the five vials of blood from JCMC, transferring them to the State Lab for analysis, and then collecting them from the lab and

9

maintaining possession of them for more than one year before trial, no detective, prosecutor, or investigator ever inspected the date of collection or patient number written on the vials and realized the discrepancy. This is true despite the incongruity between the lab's report that defendant's BAC was 0.376% -- more than four times the legal limit -- and the fact that no law enforcement officer who responded to the crash reported observing any signs that defendant was intoxicated.

The State reported the results of its investigation to the trial court and to defense counsel on July 12.

D.

On Sunday, July 14, defendant moved to dismiss the indictment with prejudice "because the state presented false testimony to the grand jurors."

During oral argument the next day, the State emphasized that it had not yet presented evidence of defendant's BAC to the jury, and it was prepared to proceed with trial "without the toxicology testimony," subjecting its witnesses to cross examination on its error. However, the State conceded that the indictment was "palpably defective" because the grand jury had heard that defendant's BAC was 0.376%, and admitted that it did not know of a "curative instruction or limiting instruction . . . that would allow th[e] trial to proceed" under those circumstances. The State specifically argued that by moving to

10

dismiss the indictment, defendant was "not objecting to termination of the trial" under N.J.S.A. 2C:1-9(d)(1), and there was also a "manifest necessity to declare a mistrial" under N.J.S.A. 2C:1-9(d)(3).

Defense counsel responded that the "case needs to be dismissed." He maintained that his client should not be forced to endure a retrial because defendant's parents had already paid more than $100,000 "to defend their son." The State was "negligent in the way they handled this case," defense counsel urged, and what the prosecutor had admitted was "an outrage."

The trial court reserved decision until later that day. On the record, the court then held that because "defendant . . . consented to the mistrial," a retrial would only be barred if the prosecutor "intended to provoke a mistrial." There was "no evidence," the court concluded, that the State "intended to provoke a mistrial." The court acknowledged that the manifest necessity standard applied only "in a situation where the defendant does not consent" to a mistrial, and again specifically found that defendant had consented, but went on to reach manifest necessity anyway. Correctly detailing the factors set forth in State v. Farmer, 48 N.J. 145 (1966), and State v. Loyal, 164 N.J. 418 (2000), the court held there was a manifest necessity to declare a mistrial because the grand jury testimony relied heavily on defendant's 0.376% BAC level, and there was no "viable alternative to a mistrial."

11

The judge then informed counsel that the jury would be discharged. The trial was thus terminated before defense counsel introduced any witnesses or evidence.

Three weeks later, defendant moved for reconsideration, again asking the court to dismiss the indictment with prejudice. Defendant argued that the State's "reckless conduct shocks the conscience and rises to the level of willful conduct which denied [his] constitutional right of 'fundamental fairness.'" Defendant also contended that the State violated his due process rights under Brady v. Maryland, 373 U.S. 83 (1963), by not preserving his blood sample and by sending another person's blood to be tested.

The trial court held oral argument and raised the issue of double jeopardy. Defendant then submitted a supplemental brief arguing that because "the State goaded" him into moving to dismiss the indictment, his motion to "bar the State from further prosecution should be granted." The State filed an opposition brief, arguing that it had not intended to provoke a mistrial or goad defendant into moving to dismiss the indictment.

After a second oral argument, the trial court issued a written opinion. The court held that the State violated defendant's due process rights under Brady. In support of that holding, the court found that the State's "handling of

12

the blood vial evidence" was not only "negligent and inept," but also supported a finding of bad faith and inexcusable neglect:

> Here, the State failed to execute the search warrant and secure the probative evidence and later relied upon non probative evidence to prosecute the defendant. <u>The detectives here cannot be said to have followed their protocols or policies in good faith, and their failure to do so warrants a finding of bad faith. The neglect that occurred here is inexcusable.</u> The State's conduct amounted to a complete abrogation of the sworn duty of the State . . . .
>
> [(emphasis added).]

As to double jeopardy, the trial court explained that "<u>in order to safeguard the Defendant's rights</u>," it had "granted a mistrial and the dismissal, without prejudice, of the indictment <u>upon the application of the Defendant</u>." (emphases added). Reiterating that the State's handling of the blood evidence was "inexcusable," the trial court found the State nonetheless did not intend "to 'goad' the Defendant into moving for a mistrial." (quoting <u>State v. Gallegan</u>, 117 N.J. 345, 358 (1989)).

The trial court also held that termination of the trial was supported by a "manifest necessity." According to the trial court, the State did not engage in "the 'oppressive' conduct contemplated by" <u>Farmer</u>, 48 N.J. at 174-75, because it was willing to continue the trial and subject its witnesses to cross examination about the error, and because the same evidence through which the

13

State could have discovered the error prior to trial "was also available to the Defendant." The court noted that, under Farmer, it was required to consider not only the rights of defendant, but also "the public right to have the accused tried and punished if found guilty," which was particularly important here given the "seriousness of the crime charged."

Because the State's "inexcusable conduct" directly impacted the three counts of the indictment that were "predicated upon a finding of the Defendant's BAC level," the trial court dismissed counts three, four, and five with prejudice. However, because defendant had not been "subjected to the quantum of oppression, harassment, or egregious deprivation necessary to warrant a dismissal" of counts one and two with prejudice, the trial court denied defendant's motion for reconsideration as to those two counts.

E.

Defendant appealed, arguing that the State's conduct was so "outrageous" that "due process principles absolutely bar[red]" a retrial. The State did not cross-appeal the dismissal of counts three, four, and five with prejudice. The Appellate Division invited the Office of the Public Defender to participate as amicus curiae. The Public Defender asserted that the trial court erred in concluding that defendant had consented to the mistrial in this case.

14

The Appellate Division held that retrial on counts one and two would not violate double jeopardy because "the mistrial was justified on the grounds of manifest necessity." State v. Zadroga, 472 N.J. Super. 1, 8 (App. Div. 2022). The Appellate Division acknowledged that it did not have access to the trial transcripts, but "presume[d]"[2] that the State had emphasized, during its opening, "that defendant was heavily intoxicated at the time of the collision," and that witnesses had testified to the same. Id. at 22. "[O]nce the sudden bombshell about the mistaken blood sample was revealed,"[3] the Appellate Division concluded, "there was no realistic way for the jurors to ignore that enormous mistake. A limiting instruction would not have sufficed to cure the massive prejudice to the State that defense counsel would surely exploit." Id. at 22-23 (emphasis added).

However, the court found that there was "ample non-alcohol-related evidence" of defendant's "criminally reckless driving to justify his re-

_____

[2] We consider it problematic that neither defendant nor the State provided the Appellate Division with trial transcripts, leaving the court to "presume" critical elements of the record.

[3] Because the Appellate Division did not have the trial transcripts, it did not know that there was no "bombshell" revelation to the jury. Rather, the State discovered the error after the conclusion of Rosario's testimony, and the motions that followed were argued outside the presence of the jury. The jury was discharged before learning anything about the mistaken identification of the blood samples as defendant's.

15

prosecution on counts one and two." Id. at 25. It therefore concluded that the proper remedy was to permit the State to re-present counts one and two "to a new grand jury, solely based on the reckless driving evidence without proof or contentions of defendant's intoxication or impairment." Id. at 8 (emphasis added); accord id. at 26 (barring the State, before a new grand jury or at trial, from "offer[ing] proof of any kind to show that defendant was under the influence of alcohol at the time of the collision").

### F.

Defendant, now represented by the Public Defender, petitioned for certification, framing the question presented as: "When an unanticipated problem with the State's evidence causes prejudice to the State's case midtrial -- a problem that was in no way caused by Defendant -- can this 'prejudice to the State' constitute a 'manifest necessity' to declare a mistrial without triggering the double jeopardy bar to a re-trial?" The State did not file a cross-petition.

We granted certification. 252 N.J. 325 (2022). We also granted leave to the Attorney General and the Association of Criminal Defense Lawyers of New Jersey (ACDL) to appear as amici curiae.

16

II.

Defendant advances several reasons why retrial should be barred. First, defendant maintains, his double jeopardy claim must be analyzed under Farmer, 48 N.J. 145, and not Kennedy, 456 U.S. 667, because he "did not consent to the mistrial in any meaningful way." Second, defendant contends that under Farmer, "where the State's inexcusable neglect created the need for a mistrial," there cannot be a manifest necessity and "double jeopardy categorially bars retrial." Third, if this Court disagrees and finds defendant consented to the mistrial, it should "hold that our State constitutional double jeopardy clause affords great[er] protection" than the Federal Constitution, and "adopt the recklessness test articulated in" Johnson instead of Kennedy's intent-based test.

The State argues that double jeopardy does not bar retrial for two independent reasons. First, it asserts that under Farmer, "termination of the trial was proper because there was a manifest necessity." Second, the State urges that the less burdensome Kennedy standard, and not Farmer, should apply because defendant consented to the mistrial. In the State's view, defendant's motion to dismiss the indictment, even with prejudice, constituted a clear waiver of his right "to have that particular trial completed by that

particular tribunal." Because, under <u>Kennedy</u>, "the State did not goad defendant into moving for a mistrial," termination was proper.

The Attorney General maintains that, as to manifest necessity, there was no alternative to granting a mistrial because the indictment itself was defective, and no "curative instruction or evidentiary limit before the petit jury" could fix that defect. The Attorney General also asserts that <u>Farmer</u> should not apply because defendant consented to the mistrial. According to the Attorney General, "[a] midtrial motion to dismiss an indictment," even with prejudice, "is intrinsically a motion to terminate the trial as a trial cannot possibly continue if a judge dismisses the indictment." The question is not "whether the defendant is consenting to retrial," the Attorney General alleges; it is "whether the defendant is consenting to not get a verdict from the jury that's been impaneled." Because defendant so consented, the <u>Kennedy</u> standard should apply. Finally, the Attorney General urges this Court not to adopt the standard articulated in <u>Johnson</u>.

The ACDL submits that "Double Jeopardy is the 'stick' that acts as a deterrent against the State violating the Defendant's due process rights at trial," and therefore must "bar the State from prosecuting the Defendant, a second time, after its bad faith and inexcusable neglect caused the trial court to declare a mistrial, so as not to prejudice the State."

18

III.

A.

A decision to dismiss an indictment is generally left to the sound discretion of the trial court and is reviewed only for abuse of discretion. See State v. Twiggs, 233 N.J. 513, 544 (2018). The decision to declare a mistrial is similarly "entrusted to the sound discretion of the trial court," and will be reversed only when it constitutes "an abuse of discretion that results in a manifest injustice." State v. Harvey, 151 N.J. 117, 205 (1997). "Whether 'manifest necessity' or 'the ends of public justice' require declaration of a mistrial depends on the unique facts of the case and the sound discretion of the trial court." Loyal, 164 N.J. at 435.

B.

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, protects defendants from repeated prosecutions for the same offense by guaranteeing that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." Our Constitution provides that "[n]o person shall, after acquittal, be tried for the same offense." N.J. Const. art. I, ¶ 11.

Despite the arguably narrower language in our State Constitution, we have "consistently interpreted the State Constitution's double-jeopardy

19

protection as coextensive with the guarantee of the federal Constitution." State v. Miles, 229 N.J. 83, 92 (2017). This is perhaps because the protection against double jeopardy has been long venerated in our state's common law. See Farmer, 48 N.J. at 168 (explaining that the difference in language between the federal and state constitutional provisions was "without distinction in meaning" in light of the "historical evolution and treatment" of the protections against double jeopardy in our state).

Even before double jeopardy was explicitly prohibited in our state's 1844 Constitution, courts in our state "recognized it, and acted upon it, as one of the most valuable principles of the common law." State v. Cooper, 13 N.J.L. 361, 370 (Sup. Ct. 1833). The framers of our 1844 Constitution then codified the already "well settled principle of the common law, that no person shall twice have his life or property endangered for the same offense." Proceedings of the New Jersey State Constitutional Convention of 1844 152 (1942); see also State v. Labato, 7 N.J. 137, 143-44 (1951) ("Immunity from repeated jeopardy was one of the cherished basic liberties of the early common law" and "constitutional guaranties against double jeopardy are [therefore] merely declaratory of the common law.").

Jeopardy "attaches after the jury is impaneled and sworn." State v. Allah, 170 N.J. 269, 279 (2002). At that point, the defendant has the right to

20

have the impaneled jury proceed to a verdict.  Id. at 280.  Double jeopardy

therefore protects "the right of the defendant to have his trial completed before

the first jury empaneled to try him."  Kennedy, 456 U.S. at 673 (emphasis

added); see also Wade v. Hunter, 336 U.S. 684, 689 (1949) (holding that the

federal Double Jeopardy Clause protects a criminal defendant's "valued right

to have his trial completed by a particular tribunal").

"However, termination of a trial after jeopardy attaches does not

necessarily prohibit subsequent re-prosecution.  Only the improper termination

of proceedings bars retrial."  Allah, 170 N.J. at 280 (emphasis added) (citation

omitted).

Termination can be proper, and a retrial not barred by double jeopardy

principles, in two circumstances.  First, where the defendant does not request

or otherwise consent to a mistrial, termination is proper and there is no bar to

retrial only if there is a "manifest necessity" to terminate the proceedings.

Loyal, 164 N.J. at 435.  The manifest necessity standard protects "the

defendant's interests in having his case finally decided by the jury first

selected while at the same time maintaining 'the public's interest in fair trials

designed to end in just judgements.'"  Kennedy, 456 U.S. at 672 (quoting

Wade, 336 U.S. at 689).  That is so because "[w]here the court finds a

sufficient legal reason and manifest necessity to terminate a trial, the

21

defendant's right to have his initial trial completed is subordinated to the public's interest in fair trials and reliable judgments." Loyal, 164 N.J. at 435.

Although "manifest necessity requires a 'high degree of necessity,' making that judgment call is 'reserved to the broad discretion of the trial judge.'" State v. Smith, 465 N.J. Super. 515, 536 (App. Div. 2020) (quoting Orie v. Sec'y Pa. Dep't of Corr., 940 F.3d 845, 851 (3d Cir. 2019)). "[T]here are no rigid rules as to what constitutes" a manifest necessity. Ibid. Instead, we have previously set forth the following considerations: (1) "Did the trial court properly exercise its discretion so that a mistrial was justified?" (2) Did the trial court "have a viable alternative" to granting a mistrial? (3) "[W]hat circumstances created the situation" that justified the mistrial, e.g., "[w]as it due to prosecutorial or defense misconduct?" (4) "Will a second trial accord with the ends of public justice and with proper judicial administration?" (5) "Will the defendant be prejudiced by a second trial, and if so, to what extent?" Loyal, 164 N.J. at 437 (quoting State v. Rechtschaffer, 70 N.J. 395, 410-11 (1976)).

Second, when the defendant requests or otherwise consents to a mistrial, manifest necessity need not be shown. Instead, under the federal Due Process Clause, termination is not improper and there is no bar to retrial as long as the prosecutor did not "'goad' the defendant into moving for a mistrial."

22

Kennedy, 456 U.S. at 673, 676. In other words, when the defendant successfully moves for a mistrial, retrial is barred only if the State "intended to provoke the defendant into moving for a mistrial." Id. at 673, 679 (emphasis added); see also id. at 676 ("Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.").

We adopted the Kennedy standard in Gallegan, 117 N.J. at 357-58 (discussing Kennedy and assessing "whether the prosecution intended to subvert [the] defendants' protection against double jeopardy by prosecutorial misconduct"), and have continued to apply it since, see, e.g., State v. Brown, 236 N.J. 497, 527-28 (2019) ("[T]he bar of double jeopardy is limited to 'those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.'" (quoting Kennedy, 456 U.S. at 679)).

In 1978, our Legislature chose to codify constitutional double jeopardy protections. Under N.J.S.A. 2C:1-9(d), "[a] prosecution of a defendant for a violation of the same provision of the statutes based upon the same facts as a former prosecution is barred" if the first trial "was improperly terminated." The statute specifically provides that

23

[t]ermination under any of the following circumstances is not improper:

> (1) The defendant consents to the termination or waives, by motion to dismiss or otherwise, his right to object to the termination.

> . . . .

> (3) The trial court finds that the termination is required by a sufficient legal reason and a manifest or absolute or overriding necessity.

[N.J.S.A. 2C:1-9(d).]

## IV.

## A.

We hold that the trial court did not abuse its discretion in finding that termination of the trial was supported by a manifest necessity. We therefore affirm.

In defendant's view, under Farmer, "a manifest necessity permits retrial only where the need for the mistrial was not created by the State's bad faith or inexcusable neglect." (emphasis added). Where there is a finding of bad faith or inexcusable neglect on the part of the State, defendant maintains, retrial is categorically barred by Farmer. We disagree.

24

Defendant's argument is based on two passages from <u>Farmer</u> that, considered in isolation, could be read to preclude a finding of manifest necessity if the State acted in bad faith or was guilty of inexcusable neglect.

The first reads:

> If in [the trial court's] judgment emergent conditions come into being which persuade him that the ends of justice for the defendant and the State cannot be achieved without aborting the trial, neither the Federal nor the State Constitution proscribes such an order. <u>This is particularly true where the circumstances which to him compel the order do not bespeak bad faith or oppressive conduct by the prosecution or a desire or effort to improve the chances of conviction at a subsequent trial</u> . . . .
>
> [48 N.J. at 171 (emphasis added) (citation omitted).]

The second is similar:

> If some unexpected, untoward and undesigned incident or circumstance arises <u>which does not bespeak bad faith, inexcusable neglect or inadvertence or oppressive conduct on the part of the State</u>, but which in the considered judgment of the trial court creates an urgent need to discontinue the trial in order to safeguard the defendant against real or apparent prejudice stemming therefrom, the Federal and State Constitutions do not stand in the way of declaration of a mistrial.
>
> [<u>Id.</u> at 174 (emphasis added).]

However, four features of <u>Farmer</u> make clear that it did not categorically bar retrial even if there is a finding that the State's conduct reflected bad faith or inexcusable neglect.

25

First, Farmer acknowledges that "there is no over-all formula, no hard and fast rule for determining when an order of mistrial will cause the jeopardy bar to spring into being, [and so] each case must depend upon its own facts and the urgency of its circumstances." Id. at 177. No "hard and fast rule" for determining when double jeopardy bars a retrial means that even a finding of bad faith or inexcusable neglect will not always bar a second trial.

Second, Farmer emphasizes the "wide range of discretion" in finding a manifest necessity "recognized in the trial judge, who has his finger on the pulse of the proceedings." Id. at 171 (explaining further that, "[i]n this sensitive area[,] appellate courts must realize that under our system the conduct of a trial is committed to the trial judge, and that in appraising the exercise of his discretionary action a wise and tolerant restraint must be practiced if the separate levels of the judicial process are to be maintained"). Placing a wide range of discretion in the trial judge is not consistent with forbidding the judge from finding a manifest necessity if he also finds the State's conduct demonstrated bad faith or inexcusable neglect.

Third, Farmer twice explains that appellate courts should not find an abuse of discretion where the trial court declares a mistrial to protect a defendant's interests. See ibid. ("[A]ppellate reluctance to interfere with a sua sponte declaration of a mistrial should be even more pronounced where it is

26

plain that a primary motive for the trial judge's course was solicitude for the defendant's interests."); id. at 175 (observing that if a court declares a mistrial "to safeguard the right of the defendant to a full and fair trial . . . there is even less basis for a claim of trespass upon the privilege against double jeopardy"). As we discuss further below, a trial court can find the State's conduct consistent with bad faith and inexcusable neglect and still find a mistrial necessary to protect the defendant's rights.

Fourth, the Farmer Court acknowledged that a declaration of manifest necessity must balance "the right of the accused to be prosecuted fairly and not oppressively" against "the societal right to have the accused tried and punished if found guilty." Id. at 175 (recognizing "the right of society to have its trial processes applied fully and fairly in the due administration of the criminal law"). Society's right to prosecute those who commit crimes can exist even when the trial court determines that a particular action of the State reflected bad faith or inexcusable neglect.

We therefore do not read Farmer to establish a per se rule that, whenever a mistrial follows the State's bad faith or inexcusable neglect, retrial is barred on all counts.

We also decline defendant's invitation to create such a rule. We instead find that application of the fact-specific balancing tests set forth in Farmer and

27

<u>Loyal</u>, which weigh all circumstances and consider both the public's interest and the defendant's rights, is the best course when the State's non-intentional misconduct leads to a mistrial.

B.

The trial court did not abuse its discretion in balancing those interests here. Several points bear mentioning.

First, the ACDL argues that "[i]nstead of declaring a mistrial, the court should have issued a corrective or limiting instruction regarding the State's incorrect assertions about the Defendant's B.A.C." It is true that a trial court abuses its discretion in finding a manifest necessity "if the court has an appropriate alternative course of action." <u>Allah</u>, 170 N.J. at 280-81. As we have observed, "a curative instruction, a short adjournment or continuance, or some other remedy, may provide a viable alternative to a mistrial, depending on the facts of the case." <u>State v. Smith</u>, 224 N.J. 36, 47 (2016).

The trial court did not abuse its discretion in finding there was no viable alternative to a mistrial here. Defendant moved to dismiss the indictment "because the state presented false testimony to the grand jurors." There is no curative instruction for that, no adjournment that can cure an indictment that was based on false testimony. And although the State indicated it was ready to proceed with trial without the toxicology evidence, submitting its witnesses to

28

cross examination on its error, defense counsel insisted that the "case need[ed] to be dismissed." The "unique circumstances of the case" must guide the decision as to whether an alternative to a mistrial exists. Ibid. Once the trial judge held that the grand jury relied heavily on defendant's 0.376% BAC level, he did not abuse his discretion in finding "no viable alternative to a mistrial."

Second, defendant frames the question presented as whether "prejudice to the State" can "constitute a 'manifest necessity' to declare a mistrial without triggering the double jeopardy bar to a re-trial." (emphasis added.) Defendant is correct that the Appellate Division stated "once the sudden bombshell about the mistaken blood sample was revealed . . . [a] limiting instruction would not have sufficed to cure the massive prejudice to the State that defense counsel would surely exploit." Zadroga, 472 N.J. Super. at 22-23 (emphasis added). However, the Appellate Division did not have access to the trial transcripts, and thus was without a record of what actually happened at trial. And the "wide range of discretion" in finding a manifest necessity is recognized not in the Appellate Division, but "in the trial judge, who has his finger on the pulse of the proceedings." Farmer, 48 N.J. at 171.

Here, the trial judge based his decision not on a concern that the State would be prejudiced by continuing with the trial, but by a desire to avoid

29

prejudicing the defendant by forcing him to continue with a trial when the grand jury may have based its decision to indict on false testimony, and when defendant therefore may not have been indicted at all without the BAC evidence. The trial court explicitly noted that it granted a mistrial "in order to safeguard the Defendant's rights." (emphasis added). We have no basis to upset that finding. Like in Farmer, notwithstanding that sentence in the Appellate Division's opinion, the trial court's primary motive for granting the mistral "was solicitude for the defendant's interests." 48 N.J. at 171.

Third, defendant contends that "allowing a retrial in this situation would allow the State to benefit from its own misconduct." The ACDL goes further, arguing that allowing a retrial would allow the State to "adjust its own strategy and tactics" in response to defendant's strategy during the first trial and also to fix "[m]istakes in jury selection, unfavorable evidentiary rulings, poor feedback from the jury, lack of witness availability, etc."

We disagree that allowing a retrial here would confer any unfair advantage on the State. Trial ended before defendant called a single witness or introduced a single piece of evidence. Defendant conceded at oral argument that the State did not intentionally goad a mistrial, and there was no "mistake in jury selection, unfavorable evidentiary ruling, or poor feedback from the jury" that the State sought to escape. We have previously held that the

30

"essence to the doctrine of jeopardy" is "that the State may not retreat from the field when its case turns sour and then be permitted to sally forth on a future day before a new jury when its case is refreshed and reinforced." Gallegan, 117 N.J. at 346 (quoting State v. Stani, 197 N.J. Super. 146, 151 (App. Div. 1984)). The State did no such thing here.

Fourth, we do not discount the "embarrassment, expense and ordeal and . . . continuing state of anxiety and insecurity" that any trial places upon a defendant. See Green v. United States, 355 U.S. 184, 187 (1957). But defendant will not suffer any substantial prejudice beyond what is inherent in any trial or retrial after appeal. For example, defendant does not contend that his witnesses or evidence are no longer available, and we do not find that he will otherwise be prejudiced in putting forth a defense in any material way.[4] Like in Farmer, "defendant has not suffered any substantial prejudice" and "the mistrial was not caused by any intention of the prosecution to take an undue advantage, or to oppress [defendant] in his effort to defend himself." See 48 N.J. at 184.

Fifth, although the trial court found that the State's handling of the blood evidence reflected bad faith and inexcusable neglect, it did not find that the

---

[4] Defense counsel conceded at argument before this Court that funds defendant's family spent on the first trial do not suffice to show prejudice for purposes of the Double Jeopardy Clause.

31

State's conduct was intentional, and defendant concedes that the State did not engage in any intentional misconduct. The trial judge held that the State did not engage in "the 'oppressive' conduct contemplated by" Farmer because it was willing to continue the trial and subject its witnesses to cross examination about its error.

Defendant contends that the "core purpose" of the Double Jeopardy Clause is to protect "defendants against the harassment of unfair, repeated prosecutions." But the trial court explicitly found that defendant had not been "subjected to the quantum of oppression, harassment, or egregious deprivation necessary to warrant a dismissal" of counts one and two with prejudice. We see no basis to disturb that finding. See, e.g., Brown, 236 N.J. at 528 (holding that "the bar of double jeopardy [did] not apply" because there was no evidence or allegation that the State acted willfully "and no evidence of prosecutorial provocation or other willful misconduct").

Finally, as the trial court found, the nature of the crime weighs strongly in favor of retrial on counts one and two. The black box on defendant's car showed it travelling 85 to 88 miles per hour three seconds before the crash, on a road that was one lane in each direction and had "a lot of curves." Zadroga, 472 N.J. Super. at 11. The posted speed limit was 25 miles per hour. There

32

was evidence that defendant's car was over the yellow lines, in Carvache's lane, at the time of the collision. And a person died in the crash.

Dismissal of charges "and a permanent bar to retrial" is "strong medicine" in any case. People v. Batts, 68 P.3d 357, 370 (Cal. 2003). "[B]y denying courts power" to try a defendant for a crime, "the purpose of law to protect society from those guilty of crimes" is frustrated. Kennedy, 456 U.S. at 672 (quoting Wade, 336 U.S. at 689).

Here, the trial court did not abuse its discretion in holding that the State should be permitted to retry defendant on those counts that did not depend on intoxication. And the Appellate Division did not err in permitting the State to re-present counts one and two "to a new grand jury, solely based on the reckless driving evidence without proof or contentions of defendant's intoxication or impairment," a determination the State does not challenge. Zadroga, 472 N.J. Super. at 8.

Prohibiting the State from putting forth any evidence or argument that defendant was intoxicated acknowledges the harm the State caused defendant by grossly mishandling the blood evidence. And allowing the State to present the charges of aggravated manslaughter and death by auto to a new grand jury, without evidence of intoxication, recognizes that a human being died in this crash.

33

## C.

Because we conclude that the trial court did not abuse its discretion in finding that the mistrial was supported by manifest necessity, we need not reach whether defendant consented to the mistrial. Cf. Smith, 465 N.J. Super. at 532 n.14 (holding that the mistrial was supported by manifest necessity and declining to address whether defendants waived their right to object to the termination).

We also need not decide whether, when a defendant consents to a mistrial, we should continue to follow our precedent and apply Kennedy's prosecutorial-misconduct-that-intended-to-provoke-a-mistrial standard or instead hold that our State Constitution's Double Jeopardy Clause provides some greater protection than the Federal Double Jeopardy Clause. We decline to comment on defendant's request that we adopt Pennsylvania's rule, set forth in Johnson, that when a defendant consents to a mistrial, retrial should be barred if prosecutorial misconduct is "undertaken recklessly, that is, with a conscious disregard for a substantial risk that [denial of a fair trial] will be the result." 231 A.3d at 826.

## V.

The judgment of the Appellate Division is affirmed, and the case is remanded to the trial court for further proceedings.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, and FASCIALE join in JUSTICE WAINER APTER's opinion. JUDGE SABATINO (temporarily assigned) did not participate.